LUDINGTON WATER-SUPPLY CO. *v.* CITY OF LUDINGTON.

1. WATER COMPANIES — LEGAL EXISTENCE — PLEADING — GENERAL ISSUE.

   The objection that a water-supply company, organized under the provisions of 1 How. Stat. § 3110 *et seq.*, to furnish water to a city, has no legal existence as a corporation, because its formation was never authorized by resolution of the common council, as required by section 3110, cannot be raised to defeat an action by it, after plea of the general issue; 2 How. Stat. § 8140, providing that a corporation plaintiff need not prove its existence unless defendant denies the same under his plea.

2. SAME — PUBLIC CONTRACT — AUTHORITY OF COMMON COUNCIL — ESTOPPEL.

   A city which, for a number of years, has acted under a contract made by its council with a water-supply company, is estopped from denying the authority of that body to enter into the contract, on the ground that there is no record of the adoption of the resolution contemplated by 1 How. Stat. § 3110, declaring it expedient to have waterworks constructed, but inexpedient that the city should construct them, where the contract recites the passage of such resolution, and the company has made large expenditures on the strength of the contract.

3. SAME — EXEMPTION FROM TAXATION — WHAT CONSTITUTES.

   An agreement by a city to pay the taxes assessed against the property of a water-supply company, in excess of a certain amount, as a part of the consideration for a supply of water, is not invalid as an exemption of property from taxation.

4. SAME — MONOPOLIES.

   Neither is such agreement invalid on the ground that it gives the particular company an advantage over similar companies that might wish to do business in the city, and tends, therefore, to create a monopoly.

5. MUNICIPAL CORPORATIONS — CONTRACTUAL POWERS — LIMITATIONS.

   A municipal contract for a water supply, valid when made, cannot be impaired by subsequent legislation limiting the taxing power of the municipality.

6. SAME.
> A charter provision that, for the purpose of paying all liabil-
> ities of the city, the council "may raise annually, by tax, *
> * * such sum as they may deem 'necessary, not exceeding
> one per cent. on the valuation," etc., does not prohibit the in-
> curring of such a liability as will accrue annually from per-
> formance of the contract creating it, merely because the
> aggregate of the accruals will exceed the one per cent. limit.

7. SAME.
> A municipal contract for future services, to be paid for as ren-
> dered, is not an "incurring of indebtedness," within a charter
> provision limiting the authority of the council in such respect.

8. SAME—INVESTIGATION OF CLAIMS—PREMATURE SUIT—PRESUMP-
TIONS.
> Where two claims under one contract were presented to a city
> at the same time, and one of them was. acted upon by the
> council, it will be presumed in an action on the other claim,
> where there is no evidence to the contrary, that the council
> had a reasonable time for investigating the claim in suit, and
> that, therefore, the action is not premature because of the
> reservation of such right to the council in the charter.

Case made from Mason; McMahon, J. Submitted
February 7, 1899. Decided March 6, 1899.

*Assumpsit* by the Ludington Water-Supply Company
against the city of Ludington for water rentals and for
taxes paid under protest. Plaintiff had judgment, and
defendant assigns error. Affirmed.

*Henry C. Hutton*, City Attorney (*Fitch & Reek*, of
counsel), for appellant.

*Charles G. Wing* (*J. W. Champlin*, of counsel), for
appellee.

MONTGOMERY, J. The plaintiff is a corporation organ-
ized in 1881, under the provisions of chapter 84, 1 How.
Stat. It has maintained its organization since that time,
and has built and continuously operated a system of water-
works since its organization in the defendant city. The
defendant city was first incorporated in the year 1873,

under a special charter, received a new charter in 1893, and passed under the general law of 1895, by taking no action after that act went into operation. On the 10th of August, 1882, the plaintiff had constructed a system of waterworks in the defendant city, and on that day a contract was entered into between the parties. The contract provided that the plaintiff company should have the right to construct and maintain a system of waterworks in the streets and alleys of the city, and contained the following recital:

"*Whereas*, the common council of said city hath, by resolution, declared that it is expedient to have constructed in said city waterworks for the purpose of supplying said city and the inhabitants thereof with water, but that it is inexpedient for said city, under the power granted in its charter, to build such works; and *whereas*, the said water-supply company, under the authority granted to them by the common council of said city, hath gone on and erected such works, and now has the same in operation in said city: *Therefore*, the said party of the first part," etc.

The contract, by its terms, was to remain in force for a period of 30 years from the 1st day of July, 1882. The city was to use 35 hydrants for fire protection, and to pay the company for them $80 per hydrant, and also to pay at the rate of $80 each for such watering troughs as the city might establish and maintain. The company agreed to complete its works within a certain time, to obtain sufficient water to supply the city and inhabitants, to maintain sufficient pressure on its mains for fire protection, etc. Under this contract, the company was permitted to obtain the water which it furnished from the channel of the harbor where the river flowed into Lake Michigan; and, as a matter of fact, it did obtain the water it furnished at that point until after the year 1892. The parties went on under this contract until July 29, 1885, when a new agreement was made between them. The new agreement recited that it was intended to supersede the former agreement between the parties. This last agreement was, by

its terms, to be and remain in force until the year 1901. By it the city agreed to pay the company the sum of $80 per hydrant for each of the 40 hydrants then in use, and a like sum for each watering trough in use, to be paid quarterly. It was provided that the company was to furnish, place, and maintain 24 additional hydrants, and one additional watering trough, to be placed as provided in the contract, and the city was to pay for them at the same rate as for the hydrants and watering troughs then already in use. The water furnished by the company was very impure. The people were dissatisfied with the quality of the water furnished, and from 1890 to 1892—a period of two years—there were almost continuous negotiations between the city and the company looking to a large extension of the system, and to the furnishing by the company of pure water.

The main point of serious difference between the parties was the matter of hydrant rentals. They had great difficulty in agreeing on the price. Finally, in 1892, the parties made a new contract, which recited the existence of the contract of 1885, and the time it had to run, the length of pipes then laid, and the number of hydrants and watering troughs in use, and then provided that the company, by the new contract, agreed to lay five miles of standard iron mains, to furnish 14 hydrants to the mile, to be placed as directed by the city, and to keep the whole 138 hydrants provided for in good repair and condition. The company agreed to keep up an ordinary water pressure of 40 pounds to the inch, to be increased to 80 pounds within 10 minutes after notice of a fire. The company further agreed that, as early in the season of 1892 as possible, it would extend its works into Lake Michigan, and furnish wholesome water, suitable for drinking, culinary purposes, and family use, and that any failure thereafter on the part of the company to furnish an abundant supply of water suited to the health of the city should work a forfeiture of the contract. The company agreed to furnish free a supply of water for the city hall, for fire-department displays,

for watering troughs then in use, for drinking fountains, and flushing sewers, etc., and then follows:

"Article 5. For the purposes of this contract, it shall be the duty of the second party to pay whatever taxes may be levied upon the following assessed valuations of its property, real and personal: For a period of five years from January 1, 1892, the taxes on an assessed valuation of $10,000; for the second five years on $15,000; for the third five years on $20,000; for the fourth five years on $25,000; for the fifth five years on $30,000; for the sixth five years on $35,000."

Article 9 of the contract provides as follows:

"For a period of 30 years from January 1, 1892, unless this contract should sooner terminate by purchase, under article 8, or otherwise, said first party agrees to protect said second party in the exercise of all street rights necessary for the proper conduct of its business; to pass and keep in force an ordinance prohibiting waste of water and meddling with fire hydrants; to pay all taxes levied against the property of said second party in excess of those mentioned in article 5 above; to pay quarterly $1,250 on the 15th of February, May, August, and November of each year, with interest at 6 per cent. after due, for the fire protection afforded by the 12 miles of main and 138 hydrants above provided for; and further agrees to pay $40 per hydrant, with not less than 14 hydrants to the mile, for all extensions hereafter ordered; and further agrees to enter into a new contract or purchase the works at the end of 30 years."

The contract contains various other provisions, and, among others, a provision giving the city the right to buy the plant, exercisable at periods of five years, on six months' notice, and provides that, if the parties do not agree as to price, the price shall be determined by three disinterested persons, not residents or property owners in the city; and the contract fixes the rate to be charged for water to private takers. This contract was duly executed by the mayor and recorder on the part of the city, the common council having authorized them to execute it.

Under this contract, the water-supply company went on, and made the extensions called for by the contract,

and fulfilled its part thereof in every substantial particular. The city also carried out its part of the contract substantially, with these exceptions: There is $1,000 due on the payment for hydrant rentals, due August 15, 1896; $1,560 was due November 15, 1896, which has not been paid; and a balance of $1,040.40 due February 15, 1897. For these items, with interest, the plaintiff brings this suit. Also, in the year 1897 the plaintiff was assessed on its property for taxes at a valuation of $50,000. Notice was served on the city, asking it to take steps to pay or take care of this tax so far as it was levied upon a valuation in excess of $15,000; but the city neglected and refused so to do. The city treasurer insisted upon collecting the whole amount. This tax amounted to the sum of $2,034.49, and it is sought to recover that amount in this suit. The city treasurer levied upon and advertised certain personal property of the company for sale under levy for said tax. The company finally, on February 28, 1898, paid this tax under protest, filing with the treasurer a written protest, setting up the contract aforesaid between the city and company as a reason why the company should not pay said tax. These claims were filed with the city in writing, and presented to the common council for audit and allowance. The claims were not verified by affidavit, nor certified to by any officer of the city; but they were received by the city without objection on that ground, referred to the proper committee, and acted upon. On March 7, 1898, the committee reported on the matter of the claim for taxes to the council, and the council rejected the claim upon its merits. The council did not act upon the claim for rentals until after this suit had been commenced, when the claim was allowed, but has not been paid. The suit was commenced March 12, 1898. The circuit judge found as a fact that the want of verification of the claims was waived by the council by accepting the claims without objection, and acting upon them on their merits. This, so far as waiver is a question of fact.

Until 1897 the property of the company had always been assessed within the contract amount, as a matter of fact, so that there was no claim for the city to pay. Under the contract of 1892, the company expended about $80,000 in extending its works, and procuring water from Lake Michigan. The property of the company, when it was assessed in the year 1897, was worth more than $50,000 at a fair cash valuation. The valuation of property in the city of Ludington for purposes of taxation for the year 1896 was $1,309,980, and the amount of taxes spread on the rolls was $30,644.09 for city purposes, exclusive of school taxes. The valuation of taxable property of the city for 1897 was $1,324,535, and the total amount of taxes levied for city purposes, exclusive of school taxes, was $22,815.60. The valuation of property for taxation in the city for 1895 was $1,325,735. In 1895 the council ordered spread for contingent purposes 1 per cent. on the valuation of 1894, and ½ per cent. for highway purposes, and $7,650 was spread on the rolls for the purpose of paying liquidation bonds, park bonds, and interest on the bonds.

The circuit judge ruled the questions hereinafter referred to in favor of the plaintiff, and judgment was entered on his written findings, which embodied the above statements of fact, and elaborate and well-considered findings of law, accompanied by a discussion and citation of authorities, which have been of exceptional aid in the consideration of the case.

The defendant contends that the plaintiff has no existence as a corporation capable of contracting, for the reason that no resolution declaring it expedient to have waterworks constructed, and that it was inexpedient for the city to build such works, was adopted by the common council; that the city had no authority to enter into such a contract for a like reason; and, further, because no such authority is given by the charter, and the contract creates an obligation prohibited by section 25 of the charter. It is also insisted that the clause in the contract agreeing to continue in force the schedule of prices for water furnished

to private consumers is an abdication of governmental functions, such as the city may not deprive itself of by contract. It is also contended that the agreement to pay taxes is *nudum pactum;* that it is against public policy, in that it furnishes an inducement to the assessing officers to assess property at less than its true cash value; that it is, in effect, an exemption of property from taxation *pro tanto,* made without legislative authority; that it creates a monopoly, in that it grants such benefits to plaintiff that it would be impossible for any other water company to compete with it.

The plaintiff was organized under chapter 84, 1 How. Stat., the first section of which (1 How. Stat. § 3110) provides for the organization of such a company in any city when the common council shall, by resolution, declare that it is expedient to have waterworks constructed, and that it is inexpedient for the municipality to build such works. The finding of the circuit judge on this question is somewhat ambiguous. He states:

"It is true that there is no evidence of the passage of such a resolution. The first contract, however, entered into in 1882, recites that the common council had adopted such a resolution, and the council directed the execution of the contract by the mayor and recorder. I am of the opinion that this is sufficient evidence of the passage of such a resolution."

The statement quoted must be construed to mean that there was no evidence of record of the adoption of such a resolution. It does appear that the circuit judge was satisfied of the fact that such a resolution was adopted.

We need not determine whether it was competent to prove by parol the fact of the adoption of this resolution, as to which see *Stevenson* v. *Bay City*, 26 Mich. 44; *Hall* v. *People*, 21 Mich. 456; *Ten Eyck* v. *Railroad Co.*, 74 Mich. 232 (32 L. R. A. 378, 16 Am. St. Rep. 633). The plaintiff is undoubtedly a corporation *de facto*, and the defendant has in this case admitted its corporate existence by the plea of the general issue. 2 How. Stat.

§ 8140; *Garton* v. *Union City Bank*, 34 Mich. 279. In the same connection, however, it is contended that, because of the failure to adopt this resolution, the city council did not have authority to contract with the plaintiff for a water supply. The point is not that the council was wholly without authority to make this contract under any circumstances, but that it failed to observe the preliminary formalities. The objection does not appeal strongly to the sense of justice. It is undoubtedly true that, when conditions precedent to corporate action exist, they are to be respected; and in any case where, as a condition to corporate action by the local governing body, such as the common council of the city, a previous vote of the people must be had, the council can neither waive nor dispense with such vote. In this case, however, the original contract recites the adoption of the resolution; and it appears · by the finding that this contract was submitted to and approved by the common council,—the same body having authority to adopt such a resolution. If this be not equivalent to the adoption of a resolution, it should estop the city after 16 years of action under it, and after large expenditures have been made on the strength of it. *Moore* v. *Mayor, etc., of New York*, 73 N. Y. 238 (29 Am. Rep. 134); 2 Dill. Mun. Corp. § 936; 1 Dill. Mun. Corp. § 463. It has been held that a contract which it was within the power of a corporation to make may be ratified by the same authority; otherwise if the contract is, in the true sense of the word, *ultra vires.* This distinction is noted in the authorities cited above, as well as in *East Jordan Lumber Co.* v. *Village of East Jordan*, 100 Mich. 201, cited by defendant. See, also, *Carey* v. *City of East Saginaw*, 79 Mich. 73.

It is contended that the provisions relating to taxes are invalid, for the reason that the city has no power, under its charter, to exempt property from taxation, and that this contract is an attempt to exempt the property of the plaintiff in excess of a certain amount from its share of the public burden. The contract does not purport to pro-

vide that the property of plaintiff shall not be assessed. Its terms indicate that it was intended by both parties that it would be assessed, and that the plaintiff would pay the taxes on the property up to a certain amount, and the defendant all in excess, as a part of the consideration for the supply of water. The city no more exempts the property of the plaintiff from taxation by such an agreement than does the mortgagor who agrees to pay the taxes levied against the mortgaged property exempt the mortgaged property from taxation. Possibly neither possesses the power to exempt property from taxation. Certainly neither has done it. The two cases cited by the learned circuit judge—*Cartersville Water Co.* v. *Mayor, etc., of Cartersville,* 89 Ga. 683, and *Grant* v. *City of Davenport,* 36 Iowa, 396—not only support the plaintiff's position in this case, but go further than it is necessary for us to go to sustain the plaintiff's contention. We need not, and therefore do not, determine what would be the effect of a distinct agreement to exempt plaintiff's property from taxation. We do hold that an agreement to pay a portion of the taxes which may be assessed against plaintiff, made upon good consideration, is not an exemption from taxation in any proper legal sense.

The proposition is stated by counsel for the defendant that a municipality, acting under charter rights granted by legislative enactment, cannot create a monopoly, unless the power to do so is expressly given, and proceeds to argue that the contract in question, in its provisions requiring the city to pay the taxes assessed, regardless of the extent of the mains or the amount of plaintiff's property, gives the company an advantage, in competition with any similar company that might wish to do business in the city; that this amounts to a practical monopoly. The proposition, baldly stated, gets down to this: The plaintiff has made a contract with the city on terms so favorable that other companies cannot compete with it. If this constitutes a monopoly, the courts will be under the duty of scrutinizing contracts with municipalities with great care. We

cannot assent to the views of counsel in respect to this claim. No exclusive rights were conferred upon the plaintiff. The city was authorized to contract for a water supply. To the extent that the contract of the city to take its supply of water from the plaintiff, and pay for it, gave the plaintiff an advantage over others desiring to do business of a like nature, it is a necessary and legitimate result of the right of contract.

It is contended that the contract is in excess of the powers of the council, for the reason that it requires an expenditure which, when added to other expenditures, exceeds the limit fixed by the charter in force when the contract was made. This charter provides as follows:

"For the purpose of defraying the expenses and all liabilities of the city (except the principal of the bonded debt), and paying the same, the common council may raise annually, by tax levied upon the real and personal property within said city, such sum as they may deem necessary, not exceeding one per cent. on the valuation of such real and personal estate within the limits of said city, according to the valuation thereof taken from the assessment roll of the year preceding the levying of such tax."

The new charter, in force in 1897, fixes the limitation of taxation at 1¼ per cent. for general purposes, ¼ per cent. for street improvements, and 3 mills on the dollar for the interest and sinking fund. The record does not disclose the amount of the assessed value of the property in the city in 1892, when this contract was made; and unless we hold that this contract may be avoided by the fact that the expenditure required to fulfill it, when added to the expense of conducting the other affairs of the municipality, exceeds the limit, or that the city was not authorized to make a contract which would create a liability to accrue in the future, the contention must fail.

If the contract was valid when made, it could not be impaired by subsequent legislation. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535; *Hammond* v. *Place*, 116 Mich. 628, and cases cited. Did the charter, as it existed when this contract was made, prohibit the incurring of

such a liability as would from time to time accrue from performance of the contract on the part of the water company, the aggregate of which would exceed the 1 per cent. limit? Defendant contends that the charter should be so construed, and cites, in support of this contention, *Putnam* v. *City of Grand Rapids*, 58 Mich. 416, and *Niles Waterworks Co.* v. *Mayor, etc., of Niles*, 59 Mich. 311. Each of these cases rested on a charter restriction which denied to the council authority to create liabilities. In the present case the restriction in the section above quoted relates to the amount of taxation for each year, and there is no express inhibition as to incurring future contingent liabilities.

The charter does limit the authority of the council in respect to incurring indebtedness, but the rule (recognized in *Putnam* v. *City of Grand Rapids*) that a contract for future services, to be paid for as rendered, is not an incurring of indebtedness, is supported by abundant authority. *Smith* v. *Inhabitants of Dedham*, 144 Mass. 177; *Davis* v. *City of Des Moines*, 71 Iowa, 500; *Crowder* v. *Town of Sullivan*, 128 Ind. 486; *Davenport* v. *Kleinschmidt*, 6 Mont. 502; *Carlyle Water, etc., Co.* v. *City of Carlyle*, 31 Ill. App. 325; *Seward* v. *Town of Liberty*, 142 Ind. 551; *Stedman* v. *City of Berlin*, 97 Wis. 505; 1 Dill. Mun. Corp. § 136*a*.

Our conclusion is that the contract is valid. The only remaining question which need be discussed is whether the action for rentals is premature. It is stated in the brief of counsel that this item of claim was presented on March 7th, and suit brought March 12th, but the finding does not so state. The charter provides that it shall be a sufficient defense to any action that it is brought before the council has had a sufficient time to investigate and pass upon the claim. There is no finding that the council had not sufficient time to investigate this claim, and take action upon it. The finding implies that the two claims were presented at the same time; and, inasmuch as the council did take action on the claim for taxes on March 7th, the

inference is that it had time in which to consider the claim for rentals.

The judgment is affirmed.

The other Justices concurred.