NORTH MICHIGAN WATER CO. *v.* CITY OF ESCANABA.

1. MUNICIPAL CORPORATIONS—FRANCHISES—PUBLIC UTILITIES.
    Where a city of the fourth class, under its special charter, had no power to grant an exclusive waterworks franchise, it did not, by adopting a resolution declaring it expedient for waterworks to be constructed but inexpedient for the city to construct them, preclude itself from later constructing the waterworks itself and make it necessary, in case it desired to operate its own system, to purchase the works of the company that, under franchise, had been supplying it with water, even though by the adoption of the resolution the waterworks act (Act No. 113, Laws 1869), under which the water company was incorporated, but which gave the company no exclusive rights in express terms, became a part of the city charter.

2. SAME—ESCANABA CHARTER.
    The special charter of the city of Escanaba (Act No. 245, Local Acts 1883) expressly prohibited the city from granting exclusive franchises.

3. SAME—PUBLIC UTILITIES—STATUTES.
    Act No. 215, Pub. Acts 1895, chap. 26, § 1 (1 Comp. Laws 1915, § 2872), providing that cities of the fourth class may construct, or purchase waterworks, is not limited in operation to cities having no water system.

4. SAME—FRANCHISES—IMPLIED CONTRACTS.
    The mere granting of a franchise by a city does not amount to an implied contract on the part of the city that it will do nothing to impair the value of the franchise or that it will not grant a rival franchise to a competing company or enter into competition itself in reference to the subject of the franchise.

5. SAME.
    The waterworks act did not give to a company, incorporated under its provisions, any exclusive rights in express terms, and none can be implied.

6. SAME.
    A franchise granted by a city to a waterworks company for a period expressly fixed at thirty years construed as not being perpetual.

7. SAME—POWER TO BORROW—LIMITATIONS—STATUTES.

Under Act No. 210, Pub. Acts 1915, § 4*b* (1 Comp. Laws 1915, § 3307), which prohibits a city from increasing by charter amendment, the amount which it may borrow by more than 2 per cent. of its assessed property valuation at any one time, a city of the fourth class which, by charter amendment under the home-rule act, has reduced its borrowing rate for the purchase or construction of waterworks from 5 per cent. to 2 per cent., cannot, by a single amendment, restore the former rate.[1]

8. APPEAL AND ERROR—CONSTITUTIONAL LAW—SCOPE OF REVIEW.

Constitutional questions will not be considered nor passed upon, on appeal, when other decisive questions are raised by the record which dispose of the case.

Cross-appeals from Delta; Flannigan, J. Submitted October 2, 1917. (Docket No. 1.) Decided December 27, 1917. Rehearing denied April 25, 1918.

Bill by the North Michigan Water Company against the city of Escanaba and others to restrain the construction and maintenance of a municipal waterworks system. From the decree rendered, all parties appeal. Modified and affirmed.

*A. H. Ryall* and *James Frost* (*Ralph W. Rymer*, of counsel), for plaintiff.

*Henry R. Dotsch* (*Thomas J. Riley* and *Lucking, Helfman, Lucking & Hanlon*, of counsel), for defendants.

STONE, J. The plaintiff is a corporation organized and existing under the laws of the State of Delaware and has been duly admitted to carry on business in this State, and owns and operates the only waterworks plant and system in the city of Escanaba. The defendant city of Escanaba is a municipal corporation, organized under the fourth-class city act. The facts

[1] On effect of limitation of municipal indebtedness upon the acquisition of a water supply or sewer system, see notes in 59 L. R. A. 604; 37 L. R. A. (N. S.) 1058.

in the case are not in dispute, but many interesting legal questions are involved in the case.

The history of such water system, and of the steps which have been taken by the parties, are so well and concisely stated by the learned circuit judge who heard the case at the circuit, that we insert a portion of it here:

"The city of Escanaba was incorporated March 28, 1883, under the provisions of Local Act 245 of that year.

"It was authorized under Public Act 5 of 1870, if not also under Local Act 245 of 1883, as it claims, to construct waterworks for the purpose of supplying itself, and its inhabitants with water. It elected not to do so and instead, on June 10, 1886, granted a franchise for that purpose to C. H. Keeler and H. E. Lamb and their assigns. The duration of the franchise was fixed at 30 years with the right reserved by the city to purchase the works at the end of 20 years by payment of the value thereof, not exceeding, however, a sum sufficient to install a similar plant, to be ascertained by appraisement to be made by three competent hydraulic engineers, to be appointed as in the franchise provided. The franchise specified substantially the plant to be put in under it and contained, generally, the grants and agreements commonly found in franchises for the installation of waterworks, including provisions for the extension of the plant as ordered by the city, for fire hydrant rental to be paid by the city and for water rates to be paid by the inhabitants.

"September 30, 1886, a resolution was passed by the council, declaring it expedient to have waterworks constructed for the purpose of supplying the city and its inhabitants with water, but inexpedient for the city to construct the same. Following the adoption of that resolution and on or about October 4, 1886, the Escanaba Waterworks Company was organized under Act No. 113, Laws of 1869 (3 Comp. Laws 1915, § 11282 *et seq.*), commonly known as the waterworks act. Immediately upon its organization it commenced, and in due course completed, a waterworks system in Escanaba.

"March 28, 1898, under commissioner's deed on foreclosure of mortgage, all and singular the rights, franchises, privileges, and property of the Escanaba Waterworks Company, passed to certain trustees who conveyed the same June 28, 1898, to the Escanaba Waterworks Company, a West Virginia corporation. April 15, 1912, the rights and property of the last-named company passed, also under a commissioner's deed on foreclosure of mortgage, to a trustee who conveyed the same, September 12, 1913, to the complainant, a corporation under the laws of the State of Delaware.

"The plant of the plaintiff, and the real and personal property owned by it used in connection with the operation of the plant, is valuable, and is assessed upon the last assessment roll of the city at $220,000. That the mesne conveyances mentioned were effectual to convey to and vest in the complainant all the property, rights, franchises, and privileges possessed by the Escanaba Waterworks Company, is not questioned.

"A written assignment of the Keeler and Lamb franchise to the Escanaba Waterworks Company was not introduced. If it ever existed it could not be found. The answer asserts the assignment was made and accepted. The bill admits it was at one time held by the complainant's predecessor. If the question whether the assignment was made and accepted becomes a material one, its execution and acceptance may fairly be presumed from the conduct of the parties. From the time of its organization the Escanaba Waterworks Company proceeded as if acting under the franchise. It built a water system substantially as therein stipulated, and it and its successors, including the plaintiff, charged and collected a hydrant rental and water rates and made extensions from time to time, as ordered by the city, under its provisions, until its expiration June 10, 1916.

"Previous to the termination of the Keeler and Lamb franchise the city authorities concluded it would be advisable for the city upon the termination of the franchise, to purchase and operate the plaintiff's plant, if it was purchasable upon terms which they consid-

ered just and reasonable and, if not, to construct and operate a new system. For such contemplated purchase or construction they thereupon set about providing ways and means.

"January 1, 1896, Escanaba became subject to Act No. 215, Pub. Acts 1895, known as the fourth-class city act. It is provided by section 14 of chapter 33 of the fourth-class city act, that, whenever any city of the fourth class shall have a population of more than 10,000 it shall be reincorporated as a city of the third class, 'at the time and in the manner provided by law for the incorporation of cities of the third class.' Before and at the time of the adoption of the charter amendments referred to later, its population exceeded 10,000, and it is suggested because of that fact that Escanaba automatically became a city of the third class, without authority to longer operate under, or to exercise, the rights and powers of cities of the fourth class. The suggestion is without merit. No law for the incorporation of cities of the third class having been passed, the defendant continued under, and was entitled to exercise, all the rights and powers granted by the fourth-class city act, among which was the right to purchase or construct new, and to maintain and extend, waterworks for supplying water for the ordinary and extraordinary uses of itself and its inhabitants, and the power to borrow on its credit and issue its bonds for any sum of money necessary in the purchase, construction, and maintenance of such works, not exceeding 5 per cent. of its assessed valuation.

"For some reason which, evidently, they have since discovered was unsound, the city authorities preferred to obligate the city for not more than 2 per cent. of its assessed valuation, and for the remaining cost of the purchase or construction to issue bonds, for the payment of which the city would not be liable, and secured only by a mortgage of the works and the revenues thereof, with suitable provision for a 20-year franchise to run to the purchaser in the event of a foreclosure and sale under the mortgage, and so, at a special election held February 14, 1916, called and held in conformity with the provisions of the so-called home-rule act, being Act No. 279, Pub. Acts 1909, as

amended (1 Comp. Laws 1915, § 3304 *et seq.*), section 3 of chapter 26 of the defendant's charter was amended to read as follows:

" 'SEC. 3. It shall be lawful for any such city, for the purpose of acquiring, operating, constructing, or purchasing a waterworks system for said city, to borrow money on the credit of the city in a sum not to exceed two per centum of the assessed value of all the real and personal property of the city, as shown by the last assessment roll, and the city may also, for the purpose of acquiring, operating, constructing or purchasing such waterworks system, issue mortgage bonds therefor, beyond the general limit of bonded indebtedness prescribed by law: *Provided*, That such mortgage bonds issued beyond the general limits of bonded indebtedness prescribed by law, shall not impose any liability upon such city, but shall be secured only upon the property and revenues of such waterworks system, including a franchise, stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise in no case shall extend for a longer period than twenty years from the date of the sale of such waterworks system, and franchise on foreclosure. Seventy-five per cent. of the net earnings of such waterworks system shall be kept and set aside as and for a sinking fund for the payment of the mortgage bonds at maturity and the interest thereon. The council shall have the power to fix the time and place of the payment of the principal and interest of the debt contracted under the provisions of this section and to issue the bonds as herein provided, but the rate of interest shall not exceed six per centum per annum: *Provided*, That the total amount expended for acquiring, operating, constructing or purchasing such waterworks system shall not exceed the estimate of expenses provided for in section four of this chapter.'

"Subsequently it was found desirable to restore, if possible, the city's borrowing power for waterworks to the limit permitted by the fourth-class city act, and accordingly, at a special election held October 4, 1916, an amendment in the exact words of section 3, chapter 26, of the fourth-class city act (1 Comp. Laws 1915, § 3167), was passed in substitution for the amendment of February 14, 1916.

"In the meantime the plaintiff was notified of the intention of the city to operate a water system from and after the expiration of the Keeler and Lamb fran-

chise, and negotiations looking to a purchase of the plaintiff's plant were opened. The city authorities caused plans for, and an estimate of the cost of, a new plant to be made, and also employed one J. E. Byrns, a resident engineer, and later Prof. H. E. Riggs, of the engineering department of the University of Michigan, to make an examination of the plaintiff's plant and an appraisal of its value. The Riggs' appraisal amounted to $229,866. The Byrns' appraisal was about $1,000 less. The city authorities offered, subject to the approval of the electors, to purchase the plaintiff's plant and pay therefor the amount of the Riggs' appraisal. Refusing to sell at the Riggs' appraisal, the plaintiff offered to sell at $375,000, or at a price, whether more or less than $375,000, to be fixed by arbitration as provided by the Keeler and Lamb franchise or by the waterworks act, at the election of the city. The city declined the plaintiff's offer. Unfortunately for all concerned further amicable effort to reach an understanding seems to have been abandoned at this point. The common council directed the city attorney to prepare the necessary resolutions appointing a special election to authorize borrowing $400,000 (representing approximately 5 per cent. of the total valuation of all property of the city on the current assessment roll) to be used in the construction of a new water system. This action, which was taken November 21, 1916, was followed, December 2, 1916, by the commencement of this suit.

"Briefly stated the plaintiff's claims are first, that under the provisions of the waterworks act it is entitled to the exclusive and perpetual right to operate a water system in Escanaba, subject only to the right of the city to acquire the same by purchase as provided in the act; and, second, that the amendment of the defendant's charter restoring its bonding limit for waterworks to 5 per cent. of its assessed valuation is in conflict with subdivision b of section 4 of the home-rule act (1 Comp. Laws 1915, § 3307), and therefore void; and void also because adopted at an election held without authority of law.

"The bill of complaint avers, in substance, that the attempt of the city to construct and operate a water system in competition with the plaintiff's, is in viola-

tion of its contractual rights, franchise, and privileges; and that, if the city is authorized to construct and operate waterworks, its attempt to provide for the payment of the cost thereof by borrowing on the credit of the city and issuing liability bonds in excess of 2 per cent. of its assessed value, is in violation of the plaintiff's rights as a taxpayer.

"The waterworks act does not expressly limit the time during which a corporation organized under it may operate its works. It is said the time is limited by the corporate life of the company fixed by its articles of association, which, in the case of the Escanaba Waterworks Company, was 30 years. That the period of operation is not controlled by the corporated life of the company would seem to be the rule. The mere acceptance of an assignment of the Keeler and Lamb franchise, coupled with the operation of the plant agreeable to its provisions, would not have the effect to limit the period of operation as stated in the franchise, and the proofs are not sufficient to raise any question of equitable estoppel.

"But, as related to this case, all questions concerning the duration of the plaintiff's right to operate are academic. The question whether the plaintiff is possessed of a perpetual right to operate its works, or of the right to operate the same for any additional time, is not involved in this case. The city has made no attempt to oust the plaintiff from its streets or alleys or to interfere with the continuance of its operations. Its attempt is limited to the installation of a new water system, without interference with, or obstruction of, the plaintiff's operations in any way. The question is not whether the plaintiff has the right to further operate, but whether it has an exclusive right to operate.

"The resolution of inexpediency passed by the common council was not effective to confer on the Escanaba Waterworks Company, or its successors, an exclusive right to operate, because the grant by the city to any person or corporation of exclusive rights was expressly forbidden by its charter. Local Acts 1883, p. 366 (Act No. 245, chap. 11, § 1, subd. 34). The rights, franchises, and privileges now possessed by the plaintiff are the same, no different or greater than

such as were conferred on its predecessor, the Escanaba Waterworks Company, by the waterworks act. This proposition is conceded by the plaintiff, and for the existence of the exclusive right which it claims reliance is had solely on the provisions of the waterworks act.

"The waterworks act does not, in express terms, grant to a corporation organized under it the exclusive right to operate waterworks in the city where it installs a plant. Cases have been cited and have been considered, which hold the grant of an exclusive right to operate a public utility may be implied. These cases are few and their reasoning unsatisfactory. The correct rule, supported by the great weight of authority and harmonizing with sound reason, is that where a franchise granted by a municipality, or where a legislative act providing for the organization of corporations to construct and operate a public utility. does not, in express terms, grant an exclusive right to operate a utility of the character provided for in the franchise or act, the law will not by implication raise an exclusive right against the public. *Skaneateles Waterworks Co.* v. *Skaneateles,* 161 N. Y. 154 (55 N. E. 562, 46 L. R. A. 687); *Skaneateles Water Co.* v. *Skaneateles,* 184 U. S. 354 (22 Sup. Ct. 400); *City of Joplin* v. *Light Co.,* 191 U. S. 150 (24 Sup. Ct. 43); *Bienville Water Supply Co.* v. *Mobile,* 175 U. S. 109 (20 Sup. Ct. 40); *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685 (17 Sup. Ct. 718); *Detroit Citizens' Street R. Co.* v. *City of Detroit,* 110 Mich. 384 (68 N. W. 304, 35 L. R. A. 859, 64 Am. St. Rep. 350); *Detroit Citizens' Street R. Co.* v. *City of Detroit,* 171 U. S. 48 (18 Sup. Ct. 732). And see *Ludington Water-Supply Co.* v. *City of Ludington,* 119 Mich. 480 (78 N. W. 558), where, speaking of the rights conferred on a corporation organized under the waterworks act, it is said: 'No exclusive rights were conferred upon the plaintiff.'

"Asserting the validity of the charter amendment increasing the liability bonding limit of the city for waterworks to 5 per cent, of assessed value, it is claimed by the city that, inasmuch as its rights and powers under the fourth-class city act were continued by section 2 of the home rule act until 'otherwise pro-

vided by law,' such rights and powers continued to exist notwithstanding a piecemeal amendment of the charter modifying the same, until otherwise provided by a law passed by the legislature, and that, no law having been passed by the legislature modifying the borrowing power of cities of the fourth class, the restrictions and limitations upon the borrowing power of the defendants are to be found only in the fourth-class city act, and that therefore the city is at liberty to shift its bonding limits for waterworks, or other purposes up and down from time to time, within the limits allowed by the fourth-class city act, regardless of any restrictions or limitations on the borrowing power of cities found in the home-rule act; and that, in any event, the 5 per cent. amendment is not in conflict with the home-rule act in view of the proviso which was added to subdivision *b* of section 4 in 1913, which reads:

"'*Provided,* That the cities now incorporated as fourth-class cities may, while so incorporated, incur indebtedness up to the limits contained in the act of incorporation.'"

At the hearing below a decree was entered to the effect that the election of October 4, 1916, was null and void; that the city be enjoined from issuing any bonds, or borrowing any money on the general credit of the city in a sum exceeding 2 per cent. of the assessed valuation of all real and personal property in said city as shown by the last assessment roll, for the purpose of acquiring, operating, constructing, or purchasing a waterworks system for said city; it was decreed that the plaintiff had no exclusive right to operate or maintain a waterworks system in said city, and that the city has the right to acquire, operate, construct, or purchase and maintain a waterworks system and may issue bonds, and borrow money therefor, within the limits prescribed by law. Both parties have appealed from this decree. We have had the benefit, not only of able oral arguments by learned counsel, but also of exhaustive briefs.

Counsel for plaintiff in their brief discuss the propositions involved under three general questions: (1) Has the city exhausted any right which it ever had to construct its own waterworks system? (2) Has the plaintiff a perpetual franchise? (3) Are the charter amendments valid?

1. It is urged by plaintiff's counsel that the city, by adopting the resolution of September 30, 1886, which resulted in the organization of the original company, exhausted the rights of the city to build a plant of its own, and restricted itself to acquiring a plant through the method prescribed by the waterworks act. The substance of that resolution of the city council was:

"That it is expedient to have constructed works, for the purpose of supplying said city and its inhabitants with water, but that it is inexpedient for the city, under the power granted in its charter, to build such works itself."

Counsel at great length make an analysis of the waterworks act, and urge that if the city now wishes to own and operate its own plant, it must do so in accordance with the provisions of that act, that is, buy the plaintiff's plant; that having passed the resolution it is precluded for all time from building a plant of its own, under the provisions of law contained in the fourth-class city statute, because by passing such a resolution it exhausted its power in the premises. Counsel cite *Ludington Water-Supply Co.* v. *City of Ludington*, 119 Mich. 480 (78 N. W. 558), and *Menominee Water Co.* v. *City of Menominee*, 124 Mich. 386 (83 N. W. 127). Both of these cases had to do with hydrant rentals, and there is nothing in either of them that is decisive of the questions here involved. Granting what is claimed that by the adoption of the resolution, the waterworks act became a part of the city charter, there is nothing of exclusive

right in its provisions. At the time of the adoption of the Keeler-Lamb franchise, and at the time of the incorporation of the original company, the city of Escanaba had no power to grant an exclusive franchise. Its special charter provided that:

"No exclusive rights, privileges or permits shall be granted by the council to any person or persons, or to any corporation, for any purpose whatever." Act No. 245, Local Acts 1883, chap. 11, § 1, subd. 34.

It is equally clear that the waterworks act, under which the original company was incorporated, gave no exclusive rights in express terms, and none can be implied. Counsel for plaintiff fail to show where that act takes from the city its right to construct its own waterworks, or water system, after the passage of the permissive resolution. Can it be that because of the passage of the resolution, the city may not, 30 years later, proceed to construct its own waterworks? We find nothing in the statutes cited to prevent it.

On January 1, 1896, the city of Escanaba became a city of the fourth class under the provisions of Act No. 215, Pub. Acts 1895 (1 Comp. Laws, §§ 2956-3371, 1 Comp. Laws 1915, §§ 2872-3294). By section 1 of chapter 26 of that act it was provided that:

"Any city incorporated or reincorporated under the provisions of this act shall have authority to purchase or construct new and to maintain and extend existing waterworks, for the introduction of water into such city, and supplying the same and the inhabitants thereof with pure and wholesome water for the ordinary and extraordinary uses of the inhabitants thereof, the extinguishment of fires and for such other purposes as the council may prescribe."

There is nothing in this section, as contended by counsel, to limit its provisions to cities having no water system. Section 3 of the same chapter authorizes a bond issue up to 5 per cent. of the assessed

value of all the property in the city to raise money "for the purpose of purchasing, constructing, or extending waterworks."

It is urged by plaintiff's counsel that the action of the city amounted to a contract. Conceding that it did, there was nothing of exclusive right in its terms. It is also claimed that the rights of the water company came from the State, and not from the city franchise. It is also said:

"The plaintiff does not base its claim on the Lamb and Keeler franchise, but asserts the rights arising from the waterworks act, thereby claiming its rights directly from the State, and not from the city, and bringing itself within the rules established by this court in *Michigan Telephone Co.* v. *City of St. Joseph,* 121 Mich. 502 (80 N. W. 383, 47 L. R. A. 87, 80 Am. St. Rep. 520); *Michigan Telephone Co.* v. *City of Benton Harbor,* 121 Mich. 512 (80 N. W. 386, 47 L. R. A. 104); *City of Lansing* v. *Michigan Power Co.,* 183 Mich. 400 (150 N. W. 250)."

This position is hardly consistent with the claim that there was a contract with the city. It should be borne in mind that we are here dealing with a local matter, and not with companies like the telephone company where franchises are granted by the State. An examination of the respective statutes will show that telephone companies do not need permission from a city to use streets and waters. Nor does the telephone act (Act No. 129, Pub. Acts 1883, 2 Comp. Laws 1915, § 8788 *et seq.*) make it the duty of the city to grant the company the use of the streets; the State itself gives the company the grant, and no action is required by the city. This is also true of the statute involved in the *Michigan Power Co. Case.* An examination of the waterworks act shows that the original company received its right to exist from the State, but only after the city council had passed the resolu-

tion. It also received certain corporate powers in section 6 of the act (Act No. 113, Laws 1869), viz.:

"To lay water pipes in and through the streets * * * of said city * * * with the consent of the municipal authorities of the city * * * under such reasonable regulations as they may prescribe."

So far as any franchise grant is concerned, it was expressly provided in said act that said grant should come from the city, as will appear by an examination of section 15 of the act.

In the instant case it appears that no new or independent ordinance was passed. The ordinance of June 10, 1886, had granted the Keeler-Lamb franchise, which had apparently been assigned to the original company, and had thus made an additional ordinance unnecessary, at least in the minds of the parties. We do not think that the cases last above cited are controlling of this case.

It is asserted by plaintiff's counsel that certain Pennsylvania and New Jersey cases hold that similar grants prevent the city from constructing competitive plants. We are referred to *Atlantic City Waterworks Co.* v. *Atlantic City*, 39 N. J. Eq. 367. In that case the complainants were incorporated under a general statute to supply Atlantic City, the defendant, with water. They afterwards contracted with the city for that purpose, and thereby accepted the provisions of certain ordinances regulating the mode of supplying the water, both for public and private purposes. They received in return exemption from municipal taxation, and also the exclusive privilege of furnishing water to the city and its inhabitants. They constructed their works at a large expense, and supplied the water, as required by their contract, satisfactorily. It was held that, whether or not the city's grant of the exclusive privilege of furnishing water was *ultra vires* and void as creating a monopoly, the city had

exhausted its power as to providing a water supply, and that the complainants' franchise was exclusive. It will be noted that in that case the city was restrained from granting a franchise to third persons, when it was at the time under an express contract with the complainants wherein the city agreed that it would not grant to any other persons the right to lay water pipes beneath the surface of the streets, etc.

The force of this decision was much affected by the subsequent case of *Atlantic City Waterworks Co.* v. *Consumers' Water Co.*, 44 N. J. Eq. 427 (15 Atl. 581), wherein it is said:

"The covenant is now a nullity, and must, for that reason, be laid out of view in the further consideration of the case. But were it still in force, or rather was the question as to its validity still undetermined, it would not help the complainant, for it is entirely clear, as I think, that unless the statute of 1876 is private and special, authorizing the formation of but a single corporation in any one of the places to which it applies, it is not within the power of the governing body of any municipality, embraced by the statute, to prevent or defeat the formation of a second corporation, by attempting to grant an exclusive right in the streets to the first, or by covenanting with the first that no like right shall be subsequently granted. A corporation formed under this act does not derive its right to lay its pipes in the public ways from the municipality where it is located, but that right is given by the statute itself."

We think the New Jersey statute is thus distinguished from the Michigan waterworks act. The leading Pennsylvania case cited by plaintiff's counsel is *White* v. *City of Meadville*, 177 Pa. 643 (35 Atl. 694, 34 L. R. A. 567). Reference to this case will show that the Pennsylvania statute differs from the Michigan act. In the *White Case* there was another exclusive grant, or right which distinguishes the case. Counsel also refer to the later case of *Pennsylvania*

*Water Co.* v. *City of Pittsburg*, 226 Pa. 624 (75 Atl. 945), as adhering to the *White Case.* The *Pittsburg Case* was heard by seven justices. Three of the justices dissented from the majority opinion. We invite attention to the dissenting opinion of Justice Mestrezat in which he refers to the *Skaneateles Case.* We think that the better doctrine is that the mere granting of a franchise does not amount to an implied contract on the part of the grantor, that it will do nothing to impair its value, or that it will not grant a rival franchise to a competing company, or enter into competition itself in reference to the subject of the franchise. *Skaneateles Water Co.* v. *Skaneateles, supra; City of Joplin* v. *Light Co., supra.*

We do not doubt that the waterworks act became a part of the charter of Escanaba, but it does not follow that there is anything in that act giving the plaintiff or its assignors exclusive rights. We agree with counsel for defendants that if a legislative act providing for the incorporation of a waterworks company gives no exclusive franchise in express terms, the law will raise no grant thereof by implication. In addition to the cases cited by the circuit judge upon this subject, counsel for defendants cite *Charles River Bridge Co.* v. *Warren Bridge,* 11 Pet. (U. S.) 420, 549.

In the *Skaneateles Case,* in the New York Court of Appeals, Chief Justice Parker said:

"It is probable that the legislature mistakenly assumed that such authorities would not act unjustly or oppressively, but would recognize the property rights of others. Be that as it may, the right to determine whether the property of an existing waterworks corporation should be taken or not, is clearly submitted to the determination of the local authorities. The refusal of the defendant, therefore, to acquire the plaintiff's property by proceedings *in invitum* does not tend to support the plaintiff's claim for an injunction. The defendant has done precisely what the statute author-

izes, and all that remains for the court to determine is whether the act was within the legislative power, or void because in contravention of the organic law."

He then discussed the nature of the rights acquired by the plaintiff, and the authorities, including the *Charles River Bridge Case,* and said of that case:

"The majority of the court agreed that the contract between the State and the plaintiff was not exclusive, and that an agreement not to authorize the erection of another bridge, could not be implied by reason of the settled rules of construction of statutes adopted under the system of jurisprudence which we have derived from the English law, viz., that public grants are to be construed strictly so as to prevent rights from being taken from the public, or given to a corporation, beyond those which the words of the grant, by their ordinary construction, convey." (Citing cases.)

We are of the opinion that the court below reached the right conclusion upon this subject.

2. Has the plaintiff a perpetual franchise? The circuit judge thought this question was not material. We think that the status of the plaintiff is involved in the case. In support of the claim that the rights of the plaintiff acquired from the State through the waterworks act are perpetual, counsel for plaintiff cite and discuss the following cases: *City of Lansing* v. *Michigan Power Co., supra; People* v. *O'Brien,* 111 N. Y. 1 (18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684) ; *City of Owensboro* v. *Telephone Co.,* 230 U. S. 58 (33 Sup. Ct. 988) ; *Michigan Telephone Co.* v. *City of St. Joseph, supra; Boise Water Co.* v. *Boise City,* 230 U. S. 84 (33 Sup. Ct. 997).

We do not think that the position of plaintiff finds support in any of the Michigan cases cited. In the *Michigan Power Co. Case* we declined to consider the question. Upon this branch of the case defendants' counsel cite the following statutes and cases: The

Waterworks Act (Act No. 113, Laws 1869, 3 Comp. Laws 1915, § 11282 *et seq.*) ; *St. Clair County Turnpike Co.* v. *Illinois,* 96 U. S. 63, 68; *Wyandotte Electric-Light Co.* v. *City of Wyandotte,* 124 Mich. 43 (82 N. W. 821) ; *City of Lansing* v. *Michigan Power Co., supra;* Michigan Constitution of 1850, art. 15, § 10; Act No. 82, Pub. Acts 1901 (3 Comp. Laws 1915, § 11300, 11301) ; *Rockwith* v. *State Road Bridge Co.,* 145 Mich. 455 (108 N. W. 785) ; *City of Detroit* v. *Railway,* 172 Mich. 136 (137 N. W. 645). Within reasonable space, we cannot discuss all of these cases. They have all been examined.

Counsel for plaintiff rely upon the *Owensboro Case;* and suggest that it overruled *St. Clair County Turnpike Co.* v. *Illinois.* In this we think counsel are mistaken. The facts in the cases were different. In the *Owensboro Case* the ordinance constituting the franchise began as follows:

"That the Cumberland Telephone Company, its successors and assigns, is authorized and hereby granted the right to erect and maintain upon the public streets and alleys of said city any number of telephone poles," etc.

Justice Lurton, in the opinion, refers to this fact and said:

"The grant by ordinance to an incorporated telephone company, its successors and assigns, of the right to occupy the streets and alleys of a city with its poles and wires for the necessary conduct of a public telephone business, is a grant of a property right in perpetuity, unless limited in duration by the grant itself, or as a consequence of some limitation imposed by the general law of the State, or by the corporate powers of the city making the grant." (Citing cases.)

Referring to the *St. Clair County Turnpike Co. Case;* Justice Lurton said:

"The case * * * has been cited and relied upon as deciding that a grant to a corporation is limited in

duration to the life of the grantee. If the case is to be regarded as holding the wide doctrine for which it has been cited, it is in conflict with the cases cited above. But it does not go so far as claimed. The grant there involved was of the right to extend an existing turnpike over a certain dyke and county bridge, and to maintain a tollgate upon the extension. The company to which this additional right was given had been incorporated for a term of 25 years. The grant was to the particular company by name, and was not to its assigns or successors. This court likened such a grant to a grant at common law to a natural person without words of restriction, * * * 'creates only an estate for the life of the grantee; for he can hold the property no longer than he himself exists.' The grant here involved was to the corporate grantee, its assigns and successors, and falls under the principle of the cases above cited."

In the *Boise City Case* the ordinance read:

"H. B. Eastman and B. M. Eastman, and their successors in interest," etc.

In the instant case there were no words of grant in the act, and the powers conferred were not conferred upon the successors and assigns of the company. The act says, in section 6 (3 Comp. Laws 1915, § 11287), "Any corporation formed under this act shall have power to introduce water." The life of the original corporation, under the act, was 30 years; and the franchise granted to Lamb and Keeler, was to remain in force and effect 30 years. We invite attention to the language of the court in *St. Clair County Turnpike Co. Case, supra,* which we think has not been modified by subsequent cases. There Justice Bradley said:

"It cannot be presumed that it was intended to be a perpetual grant; for the company itself had but a limited period of existence."

In the *Wyandotte Case* Justice GRANT, speaking for this court, said:

"An incorporation under this act, a petition to the city to erect poles and wires, or for a franchise for that purpose, and the grant of the same by the city, would make a contract binding for the life of the corporation. It would be immaterial that no time for the existence of the right or the franchise was specified. The grant in such case would be limited to the period of existence fixed by the charter. If a railroad company were organized for a period of 30 years, and a party, natural or corporate, should grant it a right of way without specifying the time of user, the grant would be for the lifetime of the corporation. The law would imply that both parties contracted with reference to its period of existence. The same rule is applicable here." (Citing the *St. Clair County Turnpike Co. Case.*)

Plaintiff's counsel urge the point that a corporation may take a franchise for a period longer than its own corporate existence, and refers to the *City of Detroit* v. *Railway Co.*, 184 U. S. 368 (22 Sup. Ct. 410). We do not question that proposition, but say that in this case no franchise was given for a longer period than the corporate existence. See *Rockwith* v. *State Road Bridge Co., supra.*

At the time of the giving of the franchise, and the incorporation of the original company in 1886, article 15, § 10, of the Constitution of 1850, read as follows:

"No corporation, except for municipal purposes, or for the construction of railroads, plank roads and canals, shall be created for a longer time than thirty years."

In 1889 this section of the Constitution was amended so that the legislature might provide for general laws applicable to any corporations, for one or more extensions of the term of such corporations, while such term was running, and not exceeding 30 years for each extension. It was not until 1901 that any provision was made for the renewal of the charter of

water companies, when Act No. 82 of the Public Acts of that year was passed (3 Comp. Laws 1915, §§ 11300, 11301). It permitted a renewal of the charter of a water company for an additional period of 30 years, but contained the following:

• "*Provided, further*, That nothing herein contained shall be construed as extending any franchise granted by any municipality for a period of years longer than the original grant."

The record discloses a certificate of the secretary of State of the reincorporation of the original company on June 3, 1916, filed June 20, 1916, continuing its corporate existence for 30 years from October 4, 1916. Also an assignment of said company to the plaintiff, dated June 3, 1916.

Without quoting further from the authorities cited by counsel, we must conclude that the rights of the original company to conduct waterworks were not perpetual, and expired with its charter; and the rights of the plaintiff are no greater than were those of the original company. This would dispose of the case were it not that the plaintiff is here also as a taxpayer, which makes it necessary to consider the remaining question.

3. Are the charter amendments valid? The learned circuit judge found, and we think correctly, that:

"Cities under the fourth-class city act are entitled to borrow money and issue bonds up to 5 per cent. of assessed value for waterworks, 5 per cent. for lighting works, 3 per cent. for sewers, 2 per cent. for public buildings, and, in addition, certain amounts for street improvement."

The amendment at special election of February 14, 1916, called and held in conformity with the provisions of the so-called home-rule act, was to the effect that the city might bond to the extent of 2 per cent. of its assessed value for the purpose of a water system.

To that extent its charter had been amended. That amendment was, in our opinion, valid. That was the situation on October 4, 1916. On that day it attempted to again amend its charter so as to permit it to bond for 5 per cent. for that purpose. This attempted amendment was void, as it made a single increase in excess of 2 per cent. of the assessed value of the real and personal property of the city. In other words, by adding together the sums for which the city of Escanaba, under its fourth-class city charter, could go into debt, a limit of indebtedness appears. It was a city in which the amount of money which could be borrowed was limited by law. By amendment it lowered it 3 per cent., making the limit for each specified purpose. It then, by the special election of October 4, 1916, attempted to increase the amount 3 per cent. This is forbidden by section 4, subd. *b,* of Act No. 210 of the Public Acts of 1915 (1 Comp. Laws 1915, § 3307), because it was a single increase exceeding 2 per cent. of the assessed value of the real and personal property in the city.

This leads us to the same conclusion upon this branch of the case as that reached by the court below. The trial court held that the proviso at the close of section 4, subd. *b,* was unconstitutional. It reads as follows:

"*Provided,* That the cities now incorporated as fourth-class cities may while so incorporated incur indebtedness up to the limits contained in the act of incorporation."

We have repeatedly held that constitutional questions will not be considered or passed upon when other decisive questions are raised by the record which dispose of the case. *People* v. *Quider,* 172 Mich. 280, and cases cited on page 289 (137 N. W. 546).

The plaintiff claims that the language of the decree

is too broad. We do not think this is so. The decree below as herein modified is affirmed.

Both parties have appealed. Under the circumstances, neither party will recover, as against the other, any costs in this court, except that each shall pay one-half of the expense of printing the record.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, and FELLOWS, JJ., concurred. BROOKE, J., did not sit.