PEOPLE *v.* PETTIJOHN.

1. CRIMINAL LAW — CONSPIRACY — GREAT WEIGHT OF EVIDENCE — CREDIBILITY OF WITNESSES.

Conviction of defendants charged with conspiracy to murder mayor of a village *held,* not against great weight of evidence, notwithstanding testimony of several witnesses linking defendants with alleged conspiracy was that of felons, it being jury's province to determine credibility of the witnesses.

2. SAME—CONSPIRACY—VENUE—OVERT ACTS.

Court having jurisdiction of place where an overt act in connection with conspiracy to murder took place has jurisdiction to try defendants charged with such conspiracy especially where both defendants were present with other conspirators on such occasion.

3. SAME—RECORDER'S COURT OF DETROIT—JURISDICTION.

Verdict of jury that recorder's court of Detroit, whose jurisdiction as to crimes was limited to those committed within such city, had jurisdiction of prosecution of defendants for conspiracy to commit murder *held,* borne out by testimony.

4. SAME—CONSPIRACY—ORDER OF PROOF.

Admission of acts and statements of conspirators before proof was offered of defendant's complicity is not in itself ground for reversal.

5. SAME—CONSPIRACY—ASSENT—INFERENCES.

The existence of the assent of minds which is involved in a conspiracy may be, and, from the secrecy of the crime, usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole.

6. SAME—INSTRUCTIONS—REQUESTS TO CHARGE.

Instruction given jury that they might disregard testimony of witnesses who testified falsely in any material fact and take into consideration the fact that four witnesses for the prosecu-

tion had been convicted of crime and give such weight to good character of defendants as jury thought defendants were entitled in prosecution for conspiracy to commit a murder *held,* fair and to have covered substantially defendants' proper requests to charge even though parts were not given with such emphasis as defendants may have preferred.

Appeal from Recorder's Court of Detroit; Maher (John J.), J. Submitted October 14, 1937. (Docket No. 126, Calendar No. 39,616.) Decided January 19, 1938.

Jesse Pettijohn and Lawrence Madden were convicted of conspiracy to murder. Affirmed.

*John J. O'Hara* and *Daniel J. O'Hara,* for appellants.

*Raymond W. Starr,* Attorney General, *Duncan C. McCrea,* Prosecuting Attorney, and *William L. Brunner* and *William E. Dowling,* Assistant Prosecuting Attorneys, for the people.

BUTZEL, J. Jesse Pettijohn and Lawrence Madden were found guilty on a charge of entering into a conspiracy to kill and murder William Voisine on the 1st day of January, 1936, and divers other days and dates up to and including the 1st day of May, 1936, in the city of Detroit. Voisine at that time was mayor of the village of Ecorse, in which city both defendants resided. It was the claim of plaintiff, as borne out by the testimony, that defendants with one John Bannerman, Dayton Dean, Ervin Lee and Frederick Gulley, and others, were members of a secret society called the Black Legion; that the society would perpetrate murder for a consideration or some other reason at the request of its members; that Voisine was violently disliked by both defend-

ants, who desired and plotted with the other conspirators to bring about his death. The entire story sounds so barbaric that it almost seems incredible unless regarded as a scheme devised by psychopaths. On the other hand, positive testimony links defendants with active participation in a conspiracy to murder Voisine and had it not been the latter's good fortune to be absent at certain times and places, defendants might have been charged with murder instead of conspiracy to commit murder.

In the presentation of its case, the prosecution first showed that Harvey Davis met Dayton Dean in the restroom of the Findlater Temple of Detroit and asked him whether he wanted to make some easy money, from $100 to $200, by killing Voisine. Neither Pettijohn nor Madden was present at this meeting nor is there any testimony to connect them with it. Shortly thereafter, however, both respondents met with Dean, Lee and Davis, and others, at a beer garden in Ecorse. The testimony shows that Davis, Dean and Pettijohn went to the basement where Pettijohn was first assured by Davis that Dean could be relied on and was to do the job; that upon inquiry being made by Davis if he had located Voisine, Pettijohn stated that they had been unsuccessful all evening in the attempt to locate him, but they would keep on trying. Dean then stated to Pettijohn that he did not come there to "fool," that he had orders to kill Voisine, that Pettijohn was the man who wanted him killed and it was up to Pettijohn to find him and the others would do the job. Pettijohn stated that he would like to do the job himself, but could not do it. It was not shown that Madden or Pettijohn offered Dean any money.

Another meeting took place at the same beer garden where Dean, Lee and Davis found Madden. Dean testified that he told Madden that he had a gun

to get Voisine that night and wanted Madden to find Pettijohn because he would know where to find Voisine. The four thereupon went to a hall in Ecorse where a political meeting was in progress, but Pettijohn had not arrived there. After making a further search for him they returned to the hall and talked over their plans. The testimony shows that at this time, Madden told Dean that his wife had been working as a nurse for Voisine and that he was the "stool pigeon" between Voisine and Pettijohn. Sometime later, Pettijohn appeared. He was informed that Dean was armed. However, they were unable to find Voisine that evening.

Dean resided on 23rd street in the city of Detroit. The record shows that sometime in March or April, 1936, Madden, Pettijohn and Davis drove to Dean's home and that Madden alighted from the car and went to the house to summon Dean and inform him that Pettijohn and Davis were out in the car and wanted to speak to him. When Dean came out, a conversation took place in which Pettijohn stated that there was to be a budget meeting of the village council that night in Ecorse and it would be a good time to find Voisine. Dean was to meet Pettijohn at his store at 7 o'clock that evening to learn whether the budget meeting would be held. That evening Dean and one Claimount drove to Pettijohn's store in Ecorse and Pettijohn told Dean that the budget meeting would not take place. Dean thereupon told Pettijohn that he had been delegated to kill Voisine and it was up to Pettijohn to locate him. Dean and two others drove to the home of Voisine in Ecorse and Dean with one Henderson, with drawn revolvers, knocked at the door of Voisine's home but no one answered. Dean thereupon walked around the house and looked through the windows, but no one was there. Dean and his associates thereupon returned

to Detroit. It is unnecessary to recite further details of the conspiracy. If the testimony of the prosecution's witnesses is true, there can be no question but that Pettijohn and Madden were parties to the conspiracy.

The motive for getting rid of Voisine was testified to by Dean as follows:

"*Q.* Did they tell you, either one of them, why they wanted to get rid of Mr. Voisine?
"*A.* Why, yes.
"*Q.* Who told you?
"*A.* Pettijohn.
"*Q.* What did he say?
"*A.* Well, he said that Voisine was in their way out there, and on account of him being a Catholic, and him being—bothering them. Well, I don't know, they seemed to have a political fight out there, the way he explained it. * * *
"*A.* Then he was a menace to the organization out there.
"*Q.* Pettijohn said this?
"*A.* Yes."

The motive for Madden's participation was an intense dislike for Voisine and his association with Pettijohn. The testimony of Dean is corroborated by that of John Bannerman, Ervin Lee and Fred Gulley. Dean, Bannerman and Lee are serving life sentences for two other murders. Gulley also was serving a term in the penitentiary for "false imprisonment" at the time of the trial. One other witness testified that Madden had remarked to him that Voisine had better watch his step or somebody would be taking him for a ride. Madden testified that he did not recall making this remark, but that, if he did, he only referred to the enmity Voisine might have incurred from gamblers.

Pettijohn and Madden each testified in his own behalf and categorically denied attending any of the

meetings or doing any of the acts showing conspiracy and denied participation in the preparation, planning, or having any desire to murder Voisine, as testified to by other witnesses. Pettijohn denied ever meeting Dean, Lee or Bannerman prior to his arrest, or that he belonged to the Black Legion, and testified that he only knew Gulley through his trading at Pettijohn's grocery store in Ecorse. Both Pettijohn and Madden denied belonging to the Black Legion. Madden also denied meeting Dean, Bannerman or Lee until after his arrest, and stated that he had no dislike for Voisine until some time after the alleged conspiracy occurred. Both defendants testified that they had never been previously arrested and they, as well as others, testified to their good reputation.

It is claimed on appeal that the verdict of the jury was against the great weight of the testimony, that both defendants were men of good reputation and character, and that they had been convicted entirely on the testimony of felons. The record has been examined with care. The jury had an opportunity both to hear and see all of the witnesses, four of whom testified that defendants were participants in the conspiracy. It was for the jury to determine their credibility. We cannot say that the verdict is against the great weight of the testimony.

Appellants further contend that the conspiracy, according to the testimony, took place in the village of Ecorse in Wayne county, and outside of the jurisdiction of the recorder's court for the city of Detroit, which is limited to offenses committed in Detroit, and therefore, they should have been tried in the Wayne circuit court where jurors from the entire county and possibly from the vicinage of Ecorse might have been selected. The testimony shows that an important meeting, at which further plans were made for the murder, was held in front

of Dean's home on 23rd street in the city of Detroit. There were present both defendants and Dean and Davis and arrangements were made to murder Voisine that night. An overt act in connection with the conspiracy thus took place in Detroit and defendants could have been tried by either the recorder's court for the city of Detroit or the Wayne circuit court. In *People* v. *Arnold,* 46 Mich. 268, 275, we said:

"It is also objected that the defendant was informed against and tried in the county of St. Joseph while the conspiracy is alleged to have been formed in Calhoun; so that the defendant has been deprived of his right to a trial by a jury of the vicinage. But the overt act was committed in St. Joseph; and according to the common-law precedents the misdemeanor may be tried wherever an overt act in pursuance of the conspiracy takes place. If a man at one end of the State conspires with others to defraud a person at the other extreme, and the fraud is actually committed, the question of hardship as between him and the prosecutor in requiring the trial for the conspiracy to be had at the place of residence of the one rather than at that of the other, presents considerations which obviously are not at all in favor of the accused. But the rule is clear and no doubt has been wisely settled. *King* v. *Brisac,* 4 East, 164 (102 Eng. Rep. 792)."

The judge further instructed the jury that the jurisdiction of the recorder's court in the city of Detroit was limited to crimes committed in the city of Detroit, and that it was a question of fact for the jury to determine whether any part of the plan to kill Voisine took place in Detroit, in which event the recorder's court would have jurisdiction, but if no part of it took place in Detroit and it all took place in Ecorse, then the court would have no jurisdiction

and it would be the duty of the jury to acquit. The record shows that the verdict of the jury as to venue was borne out by the testimony.

Appellants further claim that error was committed in admitting testimony in regard to the conversation between Dean and Davis prior to any showing that either defendant had anything to do with the conspiracy. The testimony was conditionally received by the court with the understanding that it would be stricken if defendants were not connected with it. In *People* v. *Knoll,* 258 Mich. 89, 94, we quoted with approval the following excerpts from *People* v. *Saunders,* 25 Mich. 119, 120:

"But it often happens that the existence of the conspiracy is only made out by inference from the acts and declarations of the several parties thereto; and to exclude evidence of these until the conspiracy is established in some other way would, in many cases, give the guilty parties immunity."

We also said, (258 Mich. 89, 95):

"The existence of the assent of minds which is involved in a conspiracy may be, and, from the secrecy of the crime, usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole. * * * The safest rule is to satisfy the jury by a *prima facie* case that a conspiracy existed and then to offer evidence of the declaration of any conspirator. However, * * * the declarations are often received before there is any proof of a conspiracy, and then, if the conspiracy be not shown, the jury is instructed to disregard the declaration."

Further complaint is made that the judge did not follow the requests to charge offered by the attorneys for the defendants. He substantially adopted

them.   He instructed the jury that they might disregard the testimony of any witnesses who testified falsely in any material fact; that, in weighing the testimony, they had a right to take into consideration the fact that four witnesses for the prosecution had been convicted of crime, that they might give such weight to good character of defendants as they thought they were entitled to.   Reading the charge as a whole, we believe that it was fair and that it substantially covered the proper requests to charge even though parts of it were not given with such emphasis and exactitude as counsel for defendants would have preferred.

We find that defendants had a fair trial.   There was no miscarriage of justice and, not finding any error, we affirm the judgment of conviction.

WIEST, C. J., and BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred.   FEAD, J., took no part in this decision.