### In re WINKLE.

1. Searches and Seizures—Probable Cause.

State police officers who observed defendant motorist commit a traffic violation at 2 a.m., stopped the car, found it was not registered in the name of either occupant, observed an open bottle of vodka on the front seat, ascertained the occupants were from Indiana and that the driver displayed a Florida driver's license, were told completely and radically conflicting stories as to their places of residence, their destination, purpose of trip and length of their intended stay *held*, justified in conducting a search of the car without a warrant, that uncovered various burglar tools, such search being a reasonable one under the circumstances (Const 1908, art 2, § 10, as amended in 1952).

References for Points in Headnotes

[1] 47 Am Jur, Searches and Seizures § 18.
[2] 47 Am Jur, Searches and Seizures § 6 *et seq.*

2. COURTS—QUESTIONS REVIEWABLE—CONSTITUTIONAL LAW.

> The determination that search conducted by police officers in 1958 was reasonable avoids the necessity of determining whether or not a provision of the State Constitution that narcotics and various burglar tools seized outside the curtilage of any dwelling house in this State might be admitted in evidence was contrary to the due process clause of the Constitution of the United States as construed by the supreme court of the United States in a 1961 decision (US Const, Ams 4, 14; Mich Const 1908, art 2, § 10, as amended in 1952).

In the matter of George H. Winkle on his petition for writ of habeas corpus directed to the warden of State Prison of Southern Michigan, with ancillary writ of certiorari to circuit judge of Lenawee county, to test validity of his conviction of carrying concealed weapons and having possession of burglar tools. Writs denied April 26, 1961. Petitioner appealed to United States supreme court which issued mandate ordering reconsideration in view of recent decisions. Submitted February 7, 1963. (Calendar No. 58, Docket No. 49,295–1/2.) Writs denied February 3, 1964. Rehearing denied March 4, 1964. Application for leave to appeal filed in supreme court of the United States October 2, 1964.

*Walter A. Kurz,* for petitioner.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James R. Ramsey* and *Donald T. Kane,* Assistant Attorneys General, for respondent.

*Amici Curiae:*

*Leo A. Farhat, Samuel J. Torina,* and *Thaddeus F. Hamera,* for State Bar of Michigan Committee on Criminal Jurisprudence.

*Nedwin L. Smokler, T. Harrison Stanton,* and *Gilbert M. Frimet,* for State Bar of Michigan Civil Liberties Committee.

KELLY, J. Petitioner, George H. Winkle, was convicted by the Lenawee county circuit court on January 31, 1958, for carrying a concealed weapon and having possession of burglar tools. Winkle waived jury trial and moved to suppress the seized evidence, claiming an illegal search and seizure. Winkle's motion to suppress was denied and he was convicted of both counts and sentenced to 4 to 5 years on the concealed weapon count and to 5 to 10 years on the possession of burglar tools count. The conviction and sentences were affirmed on January 4, 1960, by this Court in *People* v. *Winkle,* 358 Mich 551.

Thereafter Winkle filed for habeas corpus and certiorari in this Court, and the petition was denied. A petition for certiorari was filed in the United States supreme court on May 12, 1961, seeking review of this Court's order denying habeas corpus. The United States supreme court granted Winkle's motion for leave to proceed *in forma pauperis* and granted certiorari November 6, 1961.[1] On June 19, 1961, the United States supreme court decided the case of *Mapp* v. *Ohio,* 367 US 643 (81 S Ct 1684, 6 L ed 2d 1081, 84 ALR2d 933), and the attorney general of Michigan thereafter filed a response and suggested the cause be remanded to this Court for decision in the light of the *Mapp Case.*

Since appeal petitioner Winkle has been free on bond.

Upon receipt of the mandate from the United States supreme court, this Court on December 11, 1961, vacated our earlier denial of habeas corpus and certiorari and ordered the cause to be rebriefed and submitted to us for reconsideration. Subsequent to oral argument, this Court further requested briefs by the committees on criminal jurisprudence

---

[1] *Winkle* v. *Bannan,* 368 US 34 (82 S Ct 146, 7 L ed 2d 91).— REPORTER.

-and civil liberties of the State Bar of 'Michigan, às parties *amici curiae.*

The following facts are undisputed by both peti-tioner and respondent, and are accordingly adopted:

"On July 21, 1957, at approximately 2 a.m., peti-tioner George H. Winkle (hereinafter called Win-kle), accompanied by Lee Casteel, was traveling west on US–223, south of the city of Adrian, Michigan. As they approached the intersection of US–223 and M–52, the traffic light regulating the intersection turned amber, Winkle came to a stop on the corner of US–223 and M–52. Winkle waited for the traffic to clear on M–52, the north and south roadway, and then before the traffic light turned green, made a left-hand turn onto M–52 and proceeded south for ap-proximately 100 feet and made another left-hand turn into the driveway of the Rock Inn Motel. : :.

"Winkle had a few minutes prior, caused a tele-phone .call to be made to the Rock Inn Motel to determine the availability of accommodations on the particular night. As the Winkle car proceeded up the drive of the Rock Inn Motel they were . ap-proached from behind by a Michigan State police patrol car carrying 2 Michigan State troopers. The officers honked their horn twice as they, approached the Winkle car and the Winkle- car came to a stop, in the driveway, 20 feet east of the office of the Rock Inn Motel. Mr. Winkle got out of his car and pro-ceeded to walk towards the Michigan State police car. The driver of the State police car, Trooper Robert Golm, walked towards the Winkle. car and met Winkle somewhere in the vicinity of the rear bumper of the Winkle car. ·          '.,'

"Trooper Golm requested Winkle's driver's li-cense, and informed Winkle that they were stopping his car for disobeying the red light. Winkle dis-played to Trooper Golm a driver's license bearing the name of George Henry Winkle. He also dis-played a certificate of registration for the automobile which he was driving, in the name of Henry Wil-

liams. Winkle explained the car was his brother-in-law's. Therefore the name on the registration was different than on his driving license. Trooper Golm also requested information from Winkle as to his destination. While this conversation was occurring between Trooper Golm and Winkle, the other trooper, Anthony Pandol, was talking to Lee Casteel, the other occupant of the car. The troopers then switched, Trooper Golm going over to talk to Casteel and Trooper Pandol going over to talk to Winkle.

"Shortly after this, Trooper Golm returned and talked with Winkle and had by this time been given conflicting statements as to destination, purposes, et cetera."

At this juncture, petitioner contends, Trooper Pandol walked up to the Winkle car, without making an arrest, without knowledge of the conflicting statements made to Trooper Golm, and proceeded to make a search of the trunk of the vehicle. Respondent, however, asserts that information as to conflicting stories had either been exchanged by the troopers prior to opening the trunk or that both officers had obtained the conflicting stories separately and discussed the case prior to search. In this regard respondent refers to Trooper Golm's testimony as to knowledge he and Pandol had at the moment prior to search: "Well, at the time I thought that something was strange, because of the 2 conflicting stories that they had given us."

The record establishes that Winkle said he was going on a 2 or 3 weeks fishing vacation around Detroit and Pontiac. He said that the name of his partner was "Philbrick"; that he (Winkle) lived in a motel around Indianapolis, Indiana, and his partner lived in an apartment on Central street.

Casteel (Philbrick) told the trooper he was going to Toledo to see some girls; that he had to be back

in Indianapolis on Monday, and that he and Winkle lived together in an apartment on Central street.

A search of the trunk yielded numerous burglar tools.[2] Winkle and his partner were then handcuffed and placed in the police car. A detailed search of the vehicle also disclosed a concealed 38-caliber revolver.

When this case was first before us on leave to appeal in 358 Mich 551, our decision affirming the trial court rested solely on the validity of our Constitutional amendment, article 2, § 10, and no determination was made as to the reasonableness of the search.

Three questions will be answered in this opinion, namely:

1. Was the search and seizure an unreasonable and unlawful search?

2. Is *Mapp* v. *Ohio, supra,* applicable retrospectively?

3. Is the search and seizure exemption provision contained in article 2, § 10, of the Michigan Constitution (1908), as amended, unconstitutional and void and repugnant to and in conflict with the United States Constitution by reason of *Mapp* v. *Ohio,* thus requiring this Court to overrule its January 4, 1960, decision in *People* v. *Winkle,* 358 Mich 551?

1. *Was the search and seizure an unreasonable and unlawful search?*

June 10, 1963, Mr. Justice Clark delivered the opinion of the United States supreme court in the case of *Ker* v. *California,* 374 US 23 (83 S Ct 1623, 10 L ed 2d 726). This case referred to the standard

---

[2] "A 'Milwaukee' 1 h.p. drill, 50 feet of extension cord, 6 feet of chain, 8 assorted carbide tipped drills from 3/4 to 3/8, 2 pry bars, 3 large screw-drivers, 10-inch wire cutters, 7 assorted chisels, 7 drift pins, 2 punches, 1 center punch, 1 pair vise grip pliers, 2 Chayes Porcel point grinders, 3 lock picks and assorted skeleton keys, one 8-pound sledge hammer, two 2-cell flashlights, 2 gas masks, 1 pair leather boots, 1 pair canvas top shoes, 1 pair coveralls, nitroglycerine, nitroglycerine jelly, detonator caps, flashlight battery."

by which State searches and seizures must be evaluated, stating (pp 24, 25):

"This case raises search and seizure questions under the rule of *Mapp* v. *Ohio,* 367 US 643.  \*  \*  \* This being the first case arriving here since our opinion in *Mapp* which would afford suitable opportunity for further explication of that holding in the light of intervening experience, we granted certiorari."

Justice Clark stated (pp 31, 32):

"Preliminary to our examination of the search and seizures involved here, it might be helpful for us to indicate what was not decided in *Mapp.* First, it must be recognized that the 'principles governing the admissibility of evidence in Federal criminal trials have not been restricted  \*  \*  \* to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the Federal courts  \*  \*  \* this court has  \*  \*  \* formulated rules of evidence to be applied in Federal criminal prosecutions.' *McNabb* v. *United States* (1943), 318 US 332, 341 (63 S Ct 608, 87 L ed 819); *cf. Miller* v. *United States* (1958), 357 US 301 (78 S Ct 1190, 2 L ed 2d 1332); *Nardone* v. *United States* (1937), 302 US 379 (58 S Ct 275, 82 L ed 314). *Mapp,* however, established no assumption by this court of supervisory authority over State courts, *cf. Cleary* v. *Bolger* (1963), 371 US 392, 401 (83 S Ct 385, 9 L ed 2d 390), and, consequently, it implied no total obliteration of State laws relating to arrests and searches in favor of Federal law. *Mapp* sounded no death knell for our federalism; rather, it echoed the sentiment of *Elkins* v. *United States* (1960), 364 US 206, 221 (80 S Ct 1437, 4 L ed 2d 1669), that 'a healthy federalism depends upon the avoidance of needless conflicts between State and Federal courts' by itself urging that 'Federal-State cooperation in the solution of crime under constitutional standards will be promoted, if

only by recognition of their now mutual obligation to respect *the same fundamental criteria* in their approaches.' 367 US at 658. (Emphasis added in *Ker*.) Second, *Mapp* did not attempt the impossible task of laying down a 'fixed formula' for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures; it recognized that we would be 'met with "recurring questions of the reasonableness of searches" ' and that,. 'at any rate, "reasonableness is in the first instance for the [trial court] * * * to determine." ' "

Justice Clark then added (pp 34, 35)[3]:

"The evidence at issue, in order to be admissible, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists, 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' "

The test that the officer does not have to have legal evidence, but only sufficient facts for a reasonably discreet and prudent man, was previously enunciated in *Husty* v. *United States*, 282 US 694, (51 S Ct 240, 75 L ed 629, 74 ALR 1407), where the court held:

"To show probable cause it is not necessary that the arresting officer should have had before him legal evidence of the suspected act. It is enough if the apparent facts which have come to his attention are sufficient, in the circumstances, to lead a reasonably discreet and prudent man to believe that liquor is illegally possessed in the automobile to be searched." (Syllabus 2.)

3 The official reports, pages 24, 44 and 46, recognize the opinions in the *Ker Case* are divisive. Lawyer's Edition entitles this portion as a "separate opinion." See 10 L ed 2d 739.

Petitioner concedes that in the instant case a police officer is given authority to arrest for traffic infractions (CL 1948, § 764.15 [Stat Ann § 28.874]), but contends "that no arrest having occurred, the search was unlawful and any item seized thereby should have been excluded." (Brief in Oct No 83, 1959.)

Petitioner points out that some act designed to inform the individual of his arrest must occur. The people's brief in the earlier case conceded this to be correct, and quotes 2 MLP, Arrest, § 6, p 489, as follows:

"Although a manual seizure is not necessary, there must be some sort of personal coercion to effectuate an arrest; there is no arrest where an officer, neither taking into custody the person to be arrested nor in any way depriving him of freedom of action, merely informs him of the officer's business,"

and emphasizes the following from *Hill* v. *Taylor*, 50 Mich 549, 552:

"The officer appears to have done no more than inform him of his business, but he never took him into custody, and never, as plaintiff testifies, deprived him of freedom of action."

The people contend that not only was the petitioner deprived of freedom of action that constituted an arrest, but that Winkle was well aware of that fact, because, as stated in the people's original brief, "with 2 uniformed officers pulling up behind one in these circumstances with an insistent honking of a horn has only 1 meaning to a motorist and he realizes that stopping his vehicle is a necessity not a matter of his will any longer. That Winkle well understood this is clearly indicated by his actions in stopping immediately right in the middle of the drive although there were parking places, even leaving his lights burning coming back immediately to meet the officers

and not going in the direction of the motel office in the words of Trooper Golm—'told him that we stopped him for disobeying the red light' was 'asked' to produce his operators license and registration and was questioned at some length by 2 troopers. A familiar scene to anyone who drives a motor vehicle. The classic encounter with the traffic cop. Is it possible that appellant at any time from the moment he was stopped by the honking of the horn and the authority of the vehicle marking and occupants and at any rate from the moment he was advised of the reason for the action, could misinterpret his status as being under the control of the officer as an arrested person, temporarily perhaps, but none the less arrested? Is it conceivable that after being advised of the violation for which he was stopped Mr. Winkle could believe that, if he should be so inclined, he could tell the officer he was moving on, climb back into his vehicle and leave without permission from the officer?"

I disagree with petitioner's statement that "what was said in *People* v. *Gonzales,* 356 Mich 247, is particularly applicable to and is determinative of petitioner's fact situation and issues raised thereby as contained in the record."

The first paragraph of Judge EDWARDS' opinion in *Gonzales* is as follows (p 250):

"This case poses 2 important questions. The first is: May police who stop an automobile on a Michigan highway to issue a traffic ticket also routinely search the automobile under Michigan law? We answer this question in the negative. The second is: Are certain amendments to the Michigan Constitution authorizing admission into evidence of concealed weapons, however seized outside the curtilage of a dwelling house, repugnant to the United States Constitution? Under controlling decisions of the

United States supreme court, we answer this question in the negative also."

Gonzales was a passenger in an automobile that was stopped by State police because the car in which he was riding had only one headlight burning. No other fact was offered by the people to justify the subsequent search that resulted in the finding of a gun in the car and a bullet in Gonzales' possession. In *Gonzales,* this Court not only held that a traffic violation did not justify a *routine* search of the automobile stopped, but, also, held that an arrest consists of any act subjecting the person to the actual control and will of the person making the arrest and that police officers who see a traffic violation have authority to arrest the violator without a warrant.

The officers clearly indicated their intent, by their acts, to place petitioner under their actual control, and we agree with the people that:

"*The issuance of the summons is not involved in the question at all.* Nearly all arrests (except for offenses in which life' imprisonment is a possible result) end sooner or later. In the case of the criminal it ends with his release from jail or prison when he is again free to determine his own course of action; in the case of the violating motorist, his arrest, probably brief in duration, ends with the presentation of the summons when he too is free to determine his own course of action without interference from the officer. *It is difficult to see how, where one is in fact deprived of his liberty by the officer, and knows it, whether so informed by word or deed or both, the fact can be changed by the duration of the deprivation, or the means or place of its termination.*" (Attorney General's brief, No 83, October 1959.)

The following facts and circumstances were well known to the arresting officers: (1) It was 2 a.m. Sunday; (2) The automobile was legally stopped;

(3) The car was not registered in the name of either occupant; (4) There was an open bottle of vodka on the front seat of the automobile; (5) The men were from Indiana and the driver displayed a Florida driver's license; (6) The occupants told the troopers completely and radically conflicting stories as to their places of residence, their destination, the purpose of their trip, and the length of their intended stay.

The facts and conflicting statements of petitioner and his associate were completely inconsistent and irreconcilable with those of innocent travelers on the highway.

These facts would not only justify a law-enforcing officer who was reasonably discreet and prudent to conduct the search that uncovered the nitroglycerine, detonater caps, and a complete set of burglar tools, plus a concealed weapon, but were of such a nature that any failure to conduct the investigation, such as the troopers conducted in this case, would have constituted action that would justify reprimand for failure to carry out their duty.

The record in this case clearly shows that the search and seizure was not unreasonable nor unlawful.

2. *Is Mapp* v. *Ohio supra, applicable retrospectively?*

The district court in Maryland was faced with this question in the case of *Hall* v. *Warden, Maryland Penitentiary,* 201 F Supp 639, decided January 23, 1962, and the court said (p 643):

Until the supreme court itself clarifies the point, it is impossible for any other court or judge to be certain whether and to what extent the supreme court intended the decision in *Mapp* v. *Ohio* to be retrospective. A majority of the court of appeals of New York has concluded that the exclusionary rule stated herein should be applied in a case where the judg-

ment of conviction had not yet become final, because of a pending appeal, at the time *Mapp* v. *Ohio* was decided. *People* v. *Loria* (November 30, 1961), 10 NY2d 368 (223 NYS2d 462, 179 NE2d 478). See, also, *Shorey* v. *State* (January 23, 1962), 227 Md 385 (177 A2d 245). But it has not yet been held in any case cited or found that all persons convicted in State courts during the period between *Wolf* v. *Colorado,* 338 US 25 (69 S Ct 1359, 93 L ed 1782), and *Mapp* v. *Ohio* are entitled to a new trial or release if any evidence, obtained as the result of an unreasonable search and seizure was admitted at their trial, even though the judgment of conviction may have become final long before *Mapp* was decided and whether or not the point was raised at the trial.

"In view of the frequent use in Mr. Justice Clark's opinion of such words as 'then', 'today', and 'no longer', and the reasons given for the supreme court's previous refusal to impose the *Weeks* [*Weeks* v. *United States,* 232 US 383 (34 S Ct 341, 58 L ed 652, LRA 1915B, 834, Ann Cas 1915C, 1177)] exclusionary rule on the States, such an extreme construction appears unwarranted. I conclude that *Mapp* v. *Ohio* was not intended to require that a new trial or release must be granted to a person convicted in a State court because evidence obtained as the result of an unlawful search was admitted in evidence at the trial, where the point was not raised at the trial and the judgment had become final before the decision of the supreme court in the *Mapp Case.* See *Gaitan* v. *United States* (CCA 10), 295 F2d 277, 279, 280. In the case at bar the point was not raised at the trial or on appeal from the conviction, and the judgment had become final before *Mapp* v. *Ohio.* So, even if the evidence had been illegally seized, its admission would not have deprived petitioner of his constitutional rights."

Neither *Mapp* v. *Ohio* nor *Ker* v. *California, supra,* gives us an answer to this question and until such an answer is forthcoming, this Court will follow the

Maryland and Colorado Federal and New York State courts' reasoning above set forth, and hold that *Mapp* v. *Ohio* is not applicable retrospectively except in a case like the present one where the judgment had not become final at the time of *Mapp* v. *Ohio* because an appeal from the judgment was pending.

3. *Is the search and seizure exemption provision contained in article 2, § 10, of the Michigan Constitution (1908), as amended, unconstitutional, void and repugnant to and in conflict with the United States Constitution by reason of Mapp v. Ohio, thus requiring this Court to overrule its January 4, 1960, decision in People v. Winkle, 358 Mich 551?*

This Court has repeatedly held that constitutional questions will not be passed upon where other questions are raised which dispose of the case.

This case, due to its procedural history, is not disposed of by our holding in point 1, as is disclosed by the following quotations from the brief filed by the respondent (attorney general) and the brief filed by the State Bar of Michigan's committee on criminal jurisprudence.

Quoting from the brief for respondent:

"Subsequent to (trial court) decision a petition for habeas corpus was filed in the Supreme Court of Michigan and denied on April 26, 1961. On May 12, 1961, a petition for certiorari was filed in the office of the clerk of the United States supreme court seeking review of the order denying habeas corpus.

"The supreme court of the United States decided the case of *Mapp* v. *Ohio,* 367 US 643, on June 19, 1961.

"The attorney general of Michigan filed his response and the supreme court entered an order as follows:

" 'The motion for leave to proceed *in forma pauperis* and the petition for writ of certiorari are granted. The judgment is vacated and, as suggested by the attorney general of Michigan, the case is re-

manded for consideration in light of *Mapp* v. *Ohio,* 367 US 643.'

"Upon receipt of the mandate from the supreme court of the United States, the Supreme Court of Michigan on the 11th day of December, 1961, entered an order as follows:

"'Upon receiving and filing the mandate of the supreme court of the United States in this cause, it is ordered that the order heretofore entered herein on April 26, 1961, denying habeas corpus and certiorari to the circuit court for the county of Lenawee be and the same is hereby vacated and held for naught and that the cause be rebriefed and resubmitted to this Court for reconsideration in the light of *Mapp* v. *Ohio* 367 US 643.' "

From the brief of the committee on criminal jurisprudence, State Bar of Michigan, we quote:

"This Court has invited the State Bar of Michigan to submit briefs *amicus curiae* on the application of *Mapp* v. *Ohio* to the issues of *People* v. *Winkle*. The State Bar's committee on criminal jurisprudence does so herein, limiting itself to these 2 related questions:

"1. Does *Mapp* v. *Ohio* cause article 2, § 10, of the Michigan Constitution of 1908, as amended to date, to be in violation of the Constitution of the United States?

"2. Does *Mapp* v. *Ohio* require this Court to overrule its own January 4, 1960, decision in *People* v. *Winkle,* 358 Mich 551?

"We submit that *both* questions require a *negative* answer. Because we feel this case requires a clearcut decision on the Federal constitutionality of existing Michigan law, we intentionally avoid presenting any other basis for upholding *People* v. *Winkle,* 358 Mich 551. We hope that no other such basis will be employed by the Court."

In making an exception to our otherwise continuing policy of avoiding unnecessary constitutional

decisions, we are also aware of the fact that in the interests of effective law enforcement, law-enforcing officials and the courts of this State must be clearly advised of what is and what is not permissible search and seizure.   We are also aware that our avoiding the constitutional question could lead to the implication that:  (1) our prior decision rested on article 2, § 10, of the Michigan Constitution;  (2) the United States supreme court at 368 US 34 (remand order) vacated such prior judgment;  (3) the United States supreme court in its order of remand to this Court for further consideration cited *Mapp* v. *Ohio, supra,* as our guide in such reconsideration;  (4) this Court now decides the case on a ground other than the constitutional question;  (5) therefore, this Court has implied that *Mapp* v. *Ohio* has affected our view of the constitutionality of article 2, § 10, of the Michigan Constitution.

For the above reasons we believe the constitutional question must be considered.

Michigan has been a leading State in its effort to safeguard its citizens against illegal search and seizure.

We find Michigan's illustrious jurist, COOLEY, in 1874 (*Weimer* v. *Bunbury,* 30 Mich 201, 208) making the following comment upon the then section 26 of article 6 of the Constitution (1850):  "Its main purpose was to make sacred the privacy of the citizen's dwelling and person against everything but process issued upon a showing of legal cause for invading it."

The provisions of our recent 1908 Constitution relating to search and seizure (article 2, § 10) were commented upon in 1919 in *People* v. *Marxhausen,* 204 Mich 559, 562 (3 ALR 1505) as follows:

"Section 10, art 2, of the Constitution of the State provides:

" 'The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation.'

"This provision is the same as found in the Constitution of 1850 (art 6, § 26), and with the exception of the use of the word 'person' in place of the word 'individual' the same as found in the Constitution of 1835. It is in effect the same provision found in the Fourth Amendment to the Federal Constitution."

In the *Marxhausen Case* this Court reviewed the background of facts that led up to the adoption of the Fourth Amendment to the Federal Constitution and called attention to the arbitrary, unlawful conduct of (p 564) "a practice [that] had grown up in England. of issuing so-called writs of assistance, originally by the Star Chamber and later by the secretary of state, under color of which messengers of the king entered any and all places agreeable to themselves, searched and seized such papers and evidences as their will dictated," and referred to the 1766 resolution in the House of Commons condemning these illegal searches and seizures, quoting Chatham as follows (p 565):

" 'Every man's house is called his castle. Why? Because it is surrounded by a moat, or defended by a wall? No. It may be a straw-built hut; the wind may whistle around it, the rain may enter it, but the king cannot,"

and finally concluded the historical review of events leading up to the adoption of the Fourth Amendment by stating (p 566): "These events which we have but given in outline occurred within the memory of

the men who formulated and adopted the Fourth Amendment."

From the earliest days to the present time, a Michigan citizen has not only been "king of his castle," but all he possessed "within the curtilage."

In *People* v. *Taylor* (1851), 2 Mich 250, this Court defined "curtilage" as a "court-yard, back-side, or piece of ground lying near and belonging to a dwelling-house," and as "a space of ground within a common enclosure, belonging to a dwelling-house."

In 1850, this Court in *Pond* v. *People,* 8 Mich 150, held that a building 36 feet distant from a man's house, used for preserving the nets employed in the owner's occupation as a fisherman, is, in law, a part of his dwelling although not included with the house by a fence. The Court held that a fence is not necessary to include buildings within the curtilage, if, within a space no larger than that usually occupied for the dwelling and customary outbuildings.

In 1914, *Weeks* v. *United States,* 232 US 383 (34 S Ct 341, 58 L ed 652, LRA 1915B, 834, Ann Cas 1915C, 1177), created the Federal "exclusionary rule," holding that the Fourth Amendment barred the use of evidence secured by illegal search and seizure in a Federal prosecution, but also holding that *Weeks* had no bearing upon admissibility of evidence in State courts.

In 1949, *Wolf* v. *Colorado,* 338 US 25 (69 S Ct 1359, 93 L ed 1782), held that the right to privacy under the Fourth Amendment was enforceable against the States through the due process clause of the Fourteenth Amendment, but held that the *Weeks* exclusionary rule did not apply to the States as an essential part of the Fourteenth Amendment's due process.

In *Elkins* v. *United States,* 364 US 206, 224–232 (80 S Ct 1437, 4 L ed 2d 1669), the court set forth a table of States and their rules on admissibility of

evidence[4], disclosing that between the *Weeks* decision (1914) and the *Wolf* decision (1949) 18 States had excluded evidence of illegal search, and Michigan, in 1919 (*People* v. *Marxhausen, supra*), was the first State to so exclude.

In 1905 this Court took judicial notice of the problem of law enforcement that was created by the arrival of the automobile in an appeal (*People* v. *Schneider*, 139 Mich 673 [69 LRA 345, 5 Ann Cas 790]) involving the right of the city of Detroit to register automobiles, by stating (p 675): "We may take judicial notice that many of *these automobiles may be driven at a speed of at least 40 miles an hour.*" (Emphasis ours.)

In 1922, Justice STEERE writing for a majority of this Court, in *People* v. *Case*, 220 Mich 379 (27 ALR 686), recognized the problem (pp 388, 389):

"The automobile is a swift and powerful vehicle of recent development which has multiplied by quantity production and taken possession of our highways in battalions until the slower animal-drawn vehicles with their easily noted individuality are rare. Constructed as covered vehicles to standard form in immense quantities, and with a capacity for speed rivaling express trains, they furnish for successful commission of crime a disguising means of silent approach and swift escape unknown in the history of the world before their advent. The question of their police control and reasonable search on highways or other public places is a serious question far deeper and broader than their use in so-called 'bootlegging' or 'rum running,' which in itself is no small

[4] | MICHIGAN | — 1919 | Oklahoma | — 1923 |
|---|---|---|---|
| Kentucky | — 1920 | Wisconsin | — 1923 |
| Florida | — 1922 | Illinois | — 1924 |
| Mississippi | — 1922 | Missouri | — 1924 |
| Oregon | — 1922 | Montana | — 1924 |
| Tennessee | — 1922 | Wyoming | — 1924 |
| Washington | — 1922 | Idaho | — 1927 |
| West Virginia | — 1922 | Texas | — 1927 |
| Indiana | — 1923 | South Dakota | — 1930 |

matter. While a possession in the sense of private ownership, they are but a vehicle constructed for travel and transportation on highways. Their active use is not in homes nor on private premises, the privacy of which the law especially guards from search and seizure without process. The baffling extent to which they are successfully utilized to facilitate commission of crime of all degrees, from those against morality, chastity, and decency to robbery, rape, burglary, and murder is a matter of common knowledge. Upon that problem a condition and not a theory confronts proper administration of our criminal laws. Whether search of and seizure from an automobile upon a highway or other public place without a search warrant is unreasonable is in its final analysis to be determined as a judicial question in view of all the circumstances under which it is made."

In *People* v. *Roache* (1927), 237 Mich 215, this Court held that the defendant should be discharged on the charge of illegal possession of liquor because the only evidence was obtained by an illegal search of defendant's automobile. Justice CLARK dissenting (Justices NELSON SHARPE and STEERE joining), commented upon the automobile problem as follows (pp 220, 221):

"The automobile has come to be the convenient instrument of bandits and rum runners. So used, it presents a most difficult problem to officers in their efforts to solve crime. If the rules relative to search and seizure, as supplied to the home, be applied with like rigor to the automobile in public places, the automobile bandit and the rum runner are practically immune. That there is a necessary difference between the search of a home and the search of an automobile is recognized. *Cardella Case* (*People* v. *Cardella*, 233 Mich 505). Under most liberal rules as to probable cause to search, the officer's problem remains difficult. We are dealing with a condition,

a prevalence of crime, menacing to and destructive of the social order.. We are not confronted with theory in the abstract. The well known constitutional provision does not denounce 'all searches and seizures, but only such as are unreasonable.' *Carroll* v. *United States,* 267 US 132 (45 S Ct 280, 69 L ed 543, 39 ALR 790) ; *People* v. *Case,* 220 Mich 379 (27 ALR 686)."

December 29, 1933, this Court, in *People* v. *Stein,* 265 Mich 610 (92 ALR 481), held that a pistol uncovered as the result of an illegal search of a taxicab could not be admitted in evidence, and following this decision, by joint resolution of the house and senate, an amendment to the Michigan Constitution was proposed.[5]

The attorney general calls to this Court's attention the circumstances that existed before and at the time of the vote upon this amendment, because the circumstances contributed to the adoption of the amendment,. as follows:

"Preceding the vote in November of 1936, the State was plagued with the activities of a vicious organization known as the Black Legion. This organization dealt in senseless- murder and in venting its spleen on persons of different creeds and colors. Its activities were well known in the State through trials or examinations held in Detroit and vicinity. See the record in *People* v. *Pettijohn,* 283 Mich 108 (October, 1937, Docket No 126), a case charging conspiracy to murder the mayor of Ecorse; the record in *People* v. *Lee,* 334 Mich 217 (April 1952, Docket Nos 82 and 83), involving a murder of a Negro citizen to satisfy lust for murder and to provide target practice; and record on application of Lowell Rushing to leave to appeal (Calendar No 49178–1/2) a case involving the murder of a man because he was a Roman Catholic married to a Protestant woman and the members of

---

[5] See PA 1935, p 468.—REPORTER.

the Black Legion believed he had beaten his wife.
\* \* \*

"Recognizing the Black Legion for what it was, the Michigan Senate passed a resolution on April 20, 1937,[6] reading as follows:

" 'A resolution congratulating the Detroit police department for their work in connection with the breaking up of the Black Legion.' "

In 1936 the people readopted the first 2 sentences of article 2, § 10, of their 1908 Constitution, which read:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation,"

and then added the following proviso:

"Provided, however, That the provisions of this section shall not be construed to bar from evidence in any court of criminal jurisdiction, or in any criminal proceeding held before any magistrate or justice of the peace, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slungshot, billy, metallic knuckles, gas-ejecting device, or any other dangerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in this State."[7]

In 1952 the legislature proposed, and the people ratified, another amendment to article 2, § 10, by adding the words "any narcotic drug or drugs."[8]

In 1963, when the people of this State adopted their new Constitution, effective January 1, 1964, they retained the proviso adopted 27 years ago, and

---

[6] 1937 Senate Journal, p 624.—REPORTER.
[7] See PA 1935, p 468, and PA 1937, p 876.—REPORTER.
[8] See PA 1952, p 479, and PA 1953, p 438.—REPORTER.

readopted 10 years ago, by providing (article 1, § 11):

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a police officer outside the curtilage of any dwelling house in this State."

Petitioner contends that *Mapp* v. *Ohio* destroyed this will, wish and desire of the people of this State that has withstood the test of time from the travails of the Black Legion days down to the more peaceful days that have followed up to and including the present time, stating: "The search and seizure exemption provision contained in article 2, § 10, of the Michigan Constitution is by reason of *Mapp* v. *Ohio* repugnant to, in conflict with and in derogation of the Constitution, statutes and laws of the United States, and is not a proper exercise of the police power of the State but is unconstitutional and void."

The law applicable and the pertinent facts in regard to the search and seizure in *Mapp* and the present appeal, Winkle, were entirely different.

In Ohio evidence obtained in a search of defendant's home was admissible in a criminal prosecution, even though obtained by an unlawful search and seizure, if not taken from defendant's person by the use of brutal or offensive force (*State* v. *Mapp*, 170 Ohio St 427 [166 NE2d 387]).[9]

---

[9] This statement and citation appear in the opinion of Mr. Justice Douglas in *Mapp*, p 669. The opinion of the court, written by Mr. Justice Clark, also mentions, at p 645, the rationale applied by the Ohio court.—REPORTER.

Mr. Justice Clark, in *Mapp* v. *Ohio,* labeled the act of the law-enforcing officers (p 655) as "official lawlessness" and "a flagrant abuse" of basic rights, and set forth the following facts in regard to that search (pp 644, 645):

"On May 23, 1957, 3 Cleveland police officers arrived at appellant's residence in that city pursuant to information that 'a person [was] hiding out in the home, who was wanted for questioning in connection with a recent bombing, and that there was a large amount of policy paraphernalia being hidden in the home." Miss Mapp and her daughter by a former marriage lived on the top floor of the 2-family dwelling. * * *

"Running roughshod over appellant, a policeman 'grabbed' her, 'twisted [her] hand,' and she 'yelled [and] pleaded with him' because 'it was hurting.' Appellant, in handcuffs, was then forcibly taken upstairs to her bedroom where the officers searched a dresser, a chest of drawers, a closet and some suitcases. They also looked into a photo album and through personal papers belonging to the appellant. The search spread to the rest of the second floor including the child's bedroom, the living room, the kitchen and a dinette. The basement of the building and a trunk found therein were also searched. The obscene materials for possession of which she was ultimately convicted were discovered in the course of that widespread search.

"At the trial no search warrant was produced by the prosecution, nor was the failure to produce one explained or accounted for."

Mr. Justice Douglas in concurring, believing the facts of the search and seizure were so flagrant as to require repetition, stated (pp 666, 667):

"This criminal proceeding started with a lawless search and seizure. The police entered a home forcefully, and seized documents that were later used to convict the occupant of a crime. She lived alone

with her 15-year-old daughter in the second-floor flat of a duplex in Cleveland."

Mr. Justice Douglas further stated that to allow "the 'shabby business' of unlawful entry into a home," would rob the Fourth Amendment of meaningful force, and referred to the unusual facts surrounding the search of Miss Mapp's home, as follows (pp 670, 671):

"*Wolf* v. *Colorado, supra,* was decided in 1949. The immediate result was a storm of constitutional controversy which only today finds its end. I believe that this is an appropriate case in which to put an end to the asymmetry which *Wolf* imported into the law. * * * It is an appropriate case because the facts it presents show—as would few other cases— the casual arrogance of those who have the untrammelled power to invade one's home and to seize one's person."

A search conducted in Michigan comparable to the *Mapp* search would not have been condoned under our constitutional law, but would have been condemned. Winkle's home was not searched, but an automobile he was driving which was not registered in this name.

The obscene printed material seized in the Mapp home would not be an item that would be admissible under the Michigan proviso.

In addition to calling attention to the vast difference between the facts in *Mapp* and Winkle,[10] I quote the following from the *Mapp* decision to show the lack of unanimity in deciding State rights even under the *Mapp* circumstances.

Four members of the court (Mr. Justice Harlan, Mr. Justice Frankfurter, Mr. Justice Whittaker, and Mr. Justice Stewart) subscribed to the statement (pp 674, 672, 676, 677):

[10] See 358 Mich 551, and recitation of undisputed facts, *supra.*

"Five members of this court have simply 'reached out' to overrule *Wolf.*  *  *  *  The *Wolf* rule represents sounder constitutional doctrine than the new rule which now replaces it.  *  *  *

"The occasion which the Court has taken here is in the context of a case where the question was briefed not at all and argued only extremely tangentially. The unwisdom of overruling *Wolf* without full-dress argument is aggravated by the circumstance that that decision is a comparatively recent one (1949) to which 3 members of the present majority have at one time or other expressly subscribed, one to be sure with explicit misgivings. I would think that our obligation to the States, on whom we impose this new rule, as well as the obligation of orderly adherence to our own processes would demand that we seek that aid which adequate briefing and argument lends to the determination of an important issue."

Mr. Justice Black, after stating that in concurring in the 1949 *Wolf* v. *Colorado* decision he made known in his opinion that the Fourth Amendment, while prohibiting unreasonable search and seizure, did not bar the use of evidence so unlawfully obtained, added the following in his concurring opinion in the *Mapp Case* (pp 661, 662):

"I am still not persuaded that the Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands. For the Fourth Amendment does not itself contain any provision expressly precluding the use of such evidence, and I am extremely doubtful that such a provision could properly be inferred from nothing more than the basic command against unreasonable searches and seizures. Reflection on the problem, however, in the light of cases coming before the court since *Wolf,* has led me to conclude that when the Fourth Amendment's ban against unrea-

sonable searches and seizures is considered together with the Fifth Amendment's ban against compelled self-incrimination, a constitutional basis emerges which not only justifies but actually requires the exclusionary rule."

Mr. Justice Harlan, in *Mapp,* comments on Justice Black's refusal to join "four members of the majority," as follows (pp 685, 686):

"In conclusion, it should be noted that the majority opinion in this case is in fact an opinion only for the *judgment* overruling *Wolf,* and not for the basic rationale by which 4 members of the majority have reached that result. For my Brother Black is unwilling to subscribe to their view that the *Weeks* exclusionary rule derives from the Fourth Amendment itself, but joins the majority opinion on the premise that its end result can be achieved by bringing the Fifth Amendment to the aid of the Fourth. On that score I need only say that whatever the validity of the 'Fourth-Fifth Amendment' correlation which the *Boyd Case* (*Boyd* v. *United States,* 116 US 616 [ 6 S Ct 524, 29 L ed 746]) found, see 8 Wigmore, Evidence (3d ed, 1940), § 2184, we have only very recently again reiterated the long-established doctrine of this court that the Fifth Amendment privilege against self-incrimination is not applicable to the States." See *Cohen* v. *Hurley,* 366 US 117 (81 S Ct 954, 6 L ed 2d 156).

*Ker* v. *California,* 374 US 23 (83 S Ct 1623, 10 L ed 2d 726), affirmed defendants' (husband and wife) conviction of possession of marijuana, denying defendants' contention that their arrest in their apartment, without warrant, lacked probable cause. Mr. Justice Clark (joined by Mr. Justice Black, Mr. Justice White, and Mr. Justice Stewart), at the outset of the opinion, stated (p 25): "This being the first case arriving here since our opinion in *Mapp* which would afford suitable opportunity for further

explication of that holding in the light of intervening experience, we granted certiorari."

Mr. Justice Harlan, concurring in the *Ker* result, stated (p 45):

"The rule is unwise because the States, with their differing law-enforcement problems, should not be put in a constitutional strait jacket, and also because the States, more likely than not, will be placed in an atmosphere of uncertainty since this court's decisions in the realm of search and seizure are hardly notable for their predictability. * * * (The latter point is indeed forcefully illustrated by the fact that in the first application of its new constitutional rule the majority finds itself equally divided.)"

Mr. Justice Brennan "with whom The Chief Justice, Mr. Justice Douglas, and Mr. Justice Goldberg join," dissents, and comments upon the lack of unanimity in the *Ker* decision as follows:

"When we declared in *Mapp* that, because the rights of the Fourth Amendment were of no lesser dignity than those of the other liberties of the Bill of Rights absorbed in the Fourteenth, '* * * we can no longer permit * * * [them] to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend [their] * * * enjoyment,' 367 US at 660—I thought by these words we had laid to rest the very problems of constitutional dissonance which I fear the present case so soon revives."

The committee on criminal jurisprudence of the State Bar of Michigan in its brief stating there should be a negative vote to the question: "Does *Mapp* v. *Ohio* cause article 2, § 10, of the Michigan Constitution of 1908, as amended to date, to be in violation of the Constitution of the United States?" says:

"The United States supreme court has never answered the question whether the Michigan proviso,

or anything substantially like it, constitutes a reasonable implementation of the rights reserved to the States under the Federal Tenth Amendment. This question remains open."

The committee majors the following:

1. "When the electorate of this State accepted the proviso in 1936, when they amended it in 1952, and when they reaffirmed their support for it in the new Constitution of 1963, they did so in the context of the clear precept of the first sentence of article 2, § 10:

" 'The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures.'

"They did *not* intend to nullify the first sentence. They merely supplemented it. If nullification was intended, why did they in 1963 readopt *both* the first sentence together with the proviso? To the contrary, the 2 portions of article 2, § 10, work together. The first part protects against unreasonableness. The proviso enunciates that the seizure of particular dangerous items outside the home is reasonable.

"The first construction suggested above creates conflict, requiring the ultimate destruction of one provision or the other. The second creates harmony. It saves the whole. It makes all parts meaningful. The second, which accepts the proviso as a reasonable interpretation of man's right against unlawful search and seizure, is the more desirable, the more logical."

2. "Essentially, the *Ker* court tells us that in State prosecutions in State courts evidence is inadmissible if the result of an unreasonable search and seizure. But *Ker* recognizes that the concept of a reasonable search and seizure as relates to the States is not governed by any fixed formula. *Mapp* did not totally obliterate State search and seizure laws; it does not require States to follow Federal evidentiary rules. States are not precluded from developing their own workable search and seizure rules to meet

practical criminal investigation and law enforcement needs,—so long as such rules do not condone unreasonable searches and seizures. To the extent States can work out reasonable rules which restrict search and seizure to reasonable limitations, they are free to do so according to their practical law-enforcement needs. And, the United States supreme court recognizes that local law-enforcement needs may vary with the particular conditions and circumstances. * * *

"*Mapp* does not outlaw the Michigan proviso, because the proviso is a reasonable application of the leeway *Mapp* and *Ker* reserve to the States to work out their own rules so long as they do not condone unreasonable search and seizure. And the proviso, read and interpreted as above, does not do that."

3. "The Tenth Amendment to the United States Constitution should not be overlooked.

" 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people.*' (Emphasis added.)

"The United States supreme court in *Mapp,* 367 US 643 at 653, recognized this reservation of State power by pointing out that:

" 'Because *there can be no fixed formula,* we are admittedly met with "recurring questions of the reasonableness of searches," * * * and, at any rate, "*reasonableness is in the first* instance for the trial court * * * *to determine.*" ' (Emphasis added.)

"In *Ker* v. *California* [*supra,* 31, 83 S Ct 1629], 10 L ed 2d at 736, that court noted:

" '*Mapp,* however, established *no assumption by this court of supervisory authority over State courts,* * * * and, consequently, it implied no total *obliteration of State laws relating to arrests and searches* in favor of Federal law. *Mapp* sounded no death knell for our federalism.' (Emphasis added.)

"And *Ker* continued [p 34, 83 S Ct 1630], 10 L ed 2d at 738:

" 'The States are not * * * precluded from developing workable rules governing arrests, searches and seizures to meet "the practical demands of effective criminal investigation and law enforcement" in the States.' (Emphasis added.)"

4. "The right to freedom from unreasonable search and seizure must remain inviolate. But within the scope of that which is reasonable, as relates to enforcement of State laws in State courts, the reserved right of the States and their people to set items of contraband, and physical and moral destruction, aside for special treatment is a federally guaranteed right under the Tenth Amendment,—and the Tenth Amendment must be given equal consideration with the Fourth."

When this Court decided *People* v. *Gonzales* (1959), 356 Mich 247, the United States decision of *Wolf* v. *Colorado, supra,* prevailed, and that decision did not say we should not follow the exclusionary rule, but merely left it up to our judgment as to whether we should or should not.

This Court unanimously held in *Gonzales* (p 263) "article 2, § 10, as last amended in 1952, not offensive to the United States Constitution."

In the writer's opinion, our decision in *Gonzales,* namely, that we had the right and duty to honor the people's command as expressed in their Constitution, was forcibly expressed by the then Justice TALBOT SMITH (now United States district judge, sixth circuit) when he wrote (pp 264, 265):

"The Constitution does not define liberty, nor do we. In an absolute sense it does not exist. A myriad of commands we follow daily. But not every intrusion upon our person or property is an encroachment so gross that the spirit becomes hostage to the act and we are no longer free. Much will depend upon the circumstances attendant. The car search itself,

in the vicinity of a prison break, may be more an act of mercy than an act of oppression. The concept of freedom, then, has no fixed content. Always there is the problem of balance. The freedom of one man necessarily involves the correlative restraint of his brother. Specifically, and with reference to the criminal law, we are sensitive to the constitutional rights of alleged or convicted criminals. (See dissent, *People* v. *Moore,* 344 Mich 137, reversed, *Moore* v. *Michigan,* 355 US 155 [78 S Ct 191, 2 L ed 2d 167].) But equally sensitive are we to the demands of our people that they be as secure as may be from violence and pillage. All too often, as we know judicially, the automobile is handmaiden to the assassin. Learned Hand put the problem we will some day reach in these words:

" 'The protection of the individual from oppression and abuse by the police and other enforcing officers is indeed a major interest in a free society; but so is the effective prosecution of crime, an interest which at times seems to be forgotten. Perfection is impossible; like other human institutions criminal proceedings must be a compromise.' " [*In re Fried* (CCA 2), 161 F2d 453, 465 (1 ALR2d 996).]

The first 10 amendments to the United States Consituation were proposed in 1789 and ratified in 1791, and the Fourteenth Amendment was proposed in 1866 and ratified in 1868.

The first time the United States supreme court decided that the Fourth Amendment called for the adoption of an exclusionary rule, solely in the Federal court, was 123 years after the adoption of the Fourth Amendment, and this fact was commented upon in *Mapp* by Mr. Justice Clark, as follows (p 648):

"Finally, the Court in that case (*Weeks* v. *United States;* 232 US 383, 398 [34 S Ct 341, 58 L ed 652, LRA 1915B, 834, Ann Cas 1915C, 1177]) clearly stated that use of the seized evidence involved 'a

denial of the constitutional rights of the accused.' * * * Thus, in the year 1914, in the *Weeks Case,* this court 'for the first time' held that 'in a Federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure.' "

The common law did not sanction the exclusionary rule. Justice Cooley, in the 1874 Michigan decision, *Weimer* v. *Bunbury,* 30 Mich 201, commented on the common law and the bill of rights, stating (p 214):

"The truth is, the bills of rights in the American constitutions have not been drafted for the introduction of new law, but to secure old principles against abrogation or violation. They are conservatory instruments rather than reformatory; and they assume that the existing principles of the common law are ample for the protection of individual rights, when once incorporated in the fundamental law, and thus secured against violation."

It is evident that man's locomotion in 1791 when the Fourth Amendment was ratified did not and could not contemplate the speed or the problems of law enforcement that were created by the automobile.

Nothing in the amendments point toward a distinction between automobiles and homes in regard to necessity for a search warrant in making a legal search, but that distinction has been definitely made by our United States supreme court, and was probably created because of such problems of law enforcement as are referred to in our Michigan decisions mentioned above.

The Michigan proviso does not condone illegal search. It was an expression by the people of this State to the citizenry that if they have in their possession, outside the curtilage of their dwelling, drugs, firearms, or dangerous weapons, or things, said possessor would not have the right to question the

legality of the search as a defense to illegal posses-
sion.

That the States should not be circumscribed in the
exercise of the police power, is clearly recognized
by the United States supreme court and was ex-
pressed in *Salsburg* v. *Maryland,* 346 US 545, 550
(74 S Ct 280, 98 L ed 281), as follows: "A State has
especially wide discretion in prescribing practice re-
lating to its police power."

The difference between laws and facts applicable
to *Mapp* and *Winkle;* the lack of unanimity apparent
in the decision of *Mapp,* plus that decision's absence
of conclusions which apply to the Michigan proviso,
and our unanimous decisions in *Gonzales* and *Winkle*
to the effect that our proviso did not violate the
United States Constitution, causes the writer to
recommend that this Court by proper order reaffirm
its previous decision reported in 358 Mich 551,
*People* v. *Winkle.*

Accordingly, the order of this Court entered April
26, 1961, dismissing petitioner's writs of habeas
corpus and ancillary certiorari stands affirmed.

O'Hara, J., concurred with Kelly, J.

Dethmers, J. (*concurring*). In *Cole* v. *City of
Battle Creek,* 298 Mich 98, 104, appears the follow-
ing:

"In *Township of Warren* v. *Raymond,* 291 Mich
426, 429, we said:

" 'This court has repeatedly held that constitu-
tional questions will not be passed upon where other
questions are raised which dispose of the case.
*Smith* v. *Curran,* 267 Mich 413 (94 ALR 766);
*Stewart* v. *Algonac Savings Bank,* 263 Mich 272;
*Brown* v. *Hill,* 216 Mich 520; *North Michigan Water
Co.* v. *City of Escanaba,* 199 Mich 286; *People* v.
*Quider,* 172 Mich 280, and authorities therein cited.' "

In *People* v. *Bissonette,* 327 Mich 349, this Court declined to pass on the constitutionality, under the Fourteenth Amendment of the United States Constitution, of the very search and seizure proviso of the Michigan Constitution here attacked by petitioner, for the announced reason that it was not essential to decision of the case. Neither is it essential to decision here.

For the reasons stated in the first portion of Mr. Justice Kelly's opinion, holding that the search and seizure were not unreasonable or unlawful for the reason that they were based upon probable cause on the part of the officers to believe that there was in the automobile, or might be, evidence that a crime had been or was being committed*, I concur in affirmance of this Court's order of April 26, 1961, denying petition for writs of habeas corpus and certiorari.

Black, J., concurred in result.

Souris, J. (*concurring*). While agreeing with my Brothers Kelly and Dethmers that the search and seizure here involved were reasonable within Federal and State constitutional meaning, I am not sure I understand the basis upon which Justice Kelly reaches that conclusion nor am I in agreement with Justice Dethmers' statement that the search and seizure were reasonable because "based upon probable cause on the part of the officers to believe

---

* In *People* v. *Gonzales,* 356 Mich 247, 253, the following appears: "A lawful arrest is not a necessary condition precedent to a lawful search and seizure without warrant. Facts which indicate probable cause to believe a felony is being committed have many times been held to render 'reasonable' within constitutional terms a search and seizure without warrant. *People* v. *Licavoli,* 245 Mich 202; *People* v. *Miller,* 245 Mich 115; *People* v. *Orlando,* 305 Mich 686; *Scher* v. *United States,* 305 US 251 (59 S Ct 174, 83 L ed 151)."

To same effect, see *Carroll* v. *United States,* 267 US 132 (45 S Ct 280, 69 L ed 543, 39 ALR 790), and *Brinegar* v. *United States,* 338 US 160 (69 S Ct 1302, 93 L ed 1879).

that *there was in the automobile, or might be, evidence that a crime had been or was being committed"* (italics added).

Just last November, in *People* v. *Kuntze,* 371 Mich 419, at 426 and 427, this Court unanimously held (Justice O'HARA not participating) that a search could be made by police officers without a warrant when a crime, either a felony or a misdemeanor, was being committed by defendants in their presence or upon probable cause to believe that defendants had committed a felony. Considering what we held in *Kuntze,* and what we said,\* Justice DETHMERS' language, "that a crime had been or was being committed", is much too broad for the reason that it would permit a search in circumstances legally insufficient to justify an arrest under our law—upon probable cause to believe a *misdemeanor had been* committed.

The record before us in *Winkle,* including petitioner's own statement of facts from which Justice KELLY has quoted at length, amply supports our finding that the search and seizure of Winkle's car were constitutionally justified within the Court's holdings in *Kuntze* and the authorities therein relied upon. At the time the search commenced, from their interrogation of defendant and his companion the troopers had probable cause to believe (whether they actually did so believe is beside the point in determining the reasonableness of the search and seizure) that the automobile had been stolen. They then knew that the automobile was not owned by either occupant; that, although defendant claimed to be a resident of Indiana, he carried a Florida driver's

---

\* "It should not be implied from what has been said that search and seizure without a warrant may be made merely on probable cause to believe a misdemeanor is being committed. In this case Trooper Righter had actual knowledge, not just probable cause to believe, that a misdemeanor was in fact being committed in his presence." 371 Mich at 427.

license; and that, because of the conflicting stories the occupants of the car told the troopers, either or both occupants had lied about their residences and their destinations. Considering also the fact that the troopers' encounter with defendant and his companion occurred at 2 o'clock in the morning and that their interest was aroused initially by the defendant's haste in making a turn in violation of a traffic control signal, I cannot conceive, any more than can Justice KELLY, what justification there could have been had the troopers failed to make a search such as they did make.

Having concluded that the search and seizure were reasonable and that the objects seized were, therefore, admissible in evidence during trial, defendant's conviction is not subject to the collateral attack he makes. I agree with Justice DETHMERS that, under such circumstances, we need not, and we should not, decide the issues considered in parts 2 and 3 of Justice KELLY's opinion.

KAVANAGH, C. J., and SMITH, J., concurred with SOURIS, J.

ADAMS, J., took no part in the decision of this case.